ALEXANDER J. MARSHALL, PLAINTIFF IN ERROR, *v.* THE BAL-
TIMORE AND OHIO RAILROAD COMPANY.

A citizen of Virginia may sue the Baltimore and Ohio Railroad Company in- the
Circuit Court of the United States for Maryland, and an averment that the de-
fendants are a body corporate, created by the Legislature of Maryland, is sufficient
to give the court jurisdiction.

The constitutional privilege which a citizen of one State has to sue the citizens of
another State in the federal courts cannot be taken away by the creation of the
latter into a corporation by the laws of the State in which they live. The corpora-
tion itself may, therefore, be sued as such.

The preceding cases upon this subject, examined.

Where a contract was made to obtain a certain law from the legislature of Virginia,
and stated to be made on the basis of a prior communication, this communication
is competent evidence in a suit upon the contract.

A contract is, void, as against public policy, and can have no standing in court by
which one party stipulates to employ a number of secret agents in order to obtain
the passage of a particular law by the legislature of a State, and the other party
promises to pay a large sum of money in case the law should pass.

It was also void if, when it was made, the parties agreed to conceal from the mem-
bers of the legislature the fact that the one party was the agent of the other, and
was to receive a compensation for his services in case of the passage of the law.

And if there was no agreement to that effect, there can be no recovery upon the con-
tract, if in fact the agent did conceal from the members of the legislature that he
was an agent who was to receive compensation for his services in case of the
passage of the law.

Moreover, in this particular, case, the law which was passed was not such a one as
was stipulated for, and upon this ground there could be no recovery.

There having been a special contract between the parties by which the entire com-
pensation was regulated and made contingent, there could be no recovery on a
count for *quantum meruit.*

THIS case was brought up, by writ of error, from the Circuit
Court of the United States for the District of Maryland.

Marshall, a citizen of Virginia, sued the Railroad Company, to
recover the sum of fifty thousand dollars, which he alleged that
they owed him under a special contract, for his services in
obtaining a law from the Legislature of Virginia, granting to the
company a right of way through Virginia to the Ohio River.

The declaration set out the special contract, and also con-
tained a count for a *quantum meruit.*

The circumstances of the case are related in the opinion of
the court.

Inasmuch as one of the instructions of the Circuit Court
was that if "the services of the plaintiff were to be of the cha-
racter and description set forth in his letter to the president of
the company, dated November 17th, 1846, and the paper therein
inclosed" no "action could be maintained on the contract," it
is proper, for future reference, that both of those papers should
be inserted. They were as follows:

*Letter from A. J. Marshall to L. McLane, 17th November, 1846.*

WARRENTON, November 17.

DEAR SIR: In an interview with you a few days since, I pro-

mised to submit in writing a plan, by which I thought your much desired "right of way" through this State might be procured from our legislature. I herewith inclose my views on that subject, and shall respectfully await your reply.

In offering myself as the agent of your company to manage so delicate and important a trust, I am aware I lack that commanding reputation which of itself would point me out as best qualified for such a post. Of my qualification and fitness it is not for me to speak; and, in consequence of the absolute secrecy demanded, I cannot seek testimonials of my capacity, lest I should excite inquiry. If your judgment approves my scheme, it is probable you might get satisfactory information respecting me by a cautious conversation with John M. Gordon, A. B. Gordon, Dr. John H. Thomas, or Joseph C. Wilson, all of your city. Without impropriety, I may say for myself I have had considerable experience as a lobby member before the legislature of Virginia. For several winters past I have been before that body with difficult and important measures, affecting the improvement of this region of the country; and I think I understand the character and component material of that honorable body.

I shall have to spend six or eight weeks in Richmond, next winter, to procure important amendments to the charter of the Rappahannock Company. This will furnish reason for my presence in Richmond.

There is an effort in progress to divide our county, to which we of Warrenton are violently hostile. This furnishes another reason for myself, and also for one or two other agents, to remain in the city of Richmond during the winter.

Col. Walden and myself are interested in large bodies of land in western Virginia, near which the track of your railroad will pass. This is an ostensible reason for our active interference. I live in a range of country whose representation ought to be entirely disinterested on this question of the "right of way." Notwithstanding which, I believe a plurality of our representatives have heretofore been in opposition. I know the influences that effected this, and am happy to say they will not exist next winter.

Edmund Broaddus, for many years a representative from Culpepper, a shrewd, intelligent man, influenced this result. Broaddus was a sort of protégé of the Richmond and James River whigs, was distinguished and promoted by them, and habitually acted with them. His place is now filled by Slaughter, a personal friend of mine. I should have little fear to carry this section of the State.

The proposed plan best speaks for itself; if you think it feasi-

ble, there is no time to be lost. I hope to hear from you at your earliest leisure. With entire respect, I am your humble servant, &c.　　　　　　　　　　　　　　　　　· A. J. MARSHALL.

I tax you with the postage, as I do not wish to be known as in correspondence.

### Document accompanying the foregoing letter.

In explanation of the plan I wish to submit, it is necessary to indulge some latitude of remark on the causes which have heretofore thwarted the just pretensions of your company.

Richmond City, the Petersburg, Richmond, and Potomac Railroad, the James River Canal, and the Wheeling interests, acting in concert, have heretofore successfully combated "the right of way." These interests fall far short of a majority in the two branches of the Virginia legislature. There is no sufficient ground, in the numeric force of this antagonist interest, to discourage the hope of an eventual success. On an examination of their arguments, based either upon justice or expediency, I find nothing to challenge a conviction of right, or an assurance of high State policy. On the contrary, standing heretofore as a disinterested spectator of the struggle, I have condemned the emptiness and arrogance of their pretensions, and felt indignant at the success of their narrow, selfish, and bigoted policy.

I have observed no superiority of talent, no greater zeal, or power of advocacy in the opposition, than in favor of the "right of way." The success of a cause before our legislature, having neither justice, greater expediency, stronger advocacy, or greater numeric strength, is matter of just amazement to the defeated party. The elements of this success should be a subject of curious and deeply anxious investigation; for when the cause is known, a remedy or counteracting influence may be readily applied. I have no idea that any dishonorable measures or appliances (further than log-rolling may be one) have been used to defeat the "right of way." As to log-rolling, I am sorry to say it has grown into a system in our legislature. Members openly avow and act on it, and never conceal their bargain, except where publicity would jeopard success. No delegation are more skilful or less scrupulous at this game than our western right-of-way men; so, in that regard, there is a stand off. It seems to me the great secret of this success is the propinquity, the presence on the ground, of your opponents. The legislature sits in their midst. They exercise a vigilant, pressing, present out-of-door influence upon the members. If the capitol were located at Weston or Clarksburg, who would question success? The Richmond interest is ever present and ever pressing; her associates of the railroad

and canal are at hand, and equally active. You have no counteracting influence, and hence the success and triumph of your opponents. If I am right in these views, your claims, resting alone on justice, sectional necessity, or even high State policy, will be urged in vain, and must become as mere sounding clamor in the hall, unless you meet your opponents with the weapons they use so successfully against yourselves. Experience shows that something beyond what you have heretofore done is necessary to success; and in this necessity the plan I have to submit has its origin.

The mass of the members in our legislature are a thoughtless, careless, light-hearted body of men, who come there for the "per diem," and to spend the "per diem." For a brief space they feel the importance and responsibility of their position. They soon, however, engage in idle pleasures, and, on all questions disconnected with their immediate constituents, they become as wax, to be moulded by the most pressing influences. You need the vote of this careless mass, and if you adopt efficient means you can obtain it. I never saw a class of men more eminently kind and social in their intercourse. Through these qualities they may be approached and influenced to do any thing not positively wrong, or which will not affect prejudicially their immediate constituency. On this question of the "right of way," a decided majority of the members can vote either way without fear of their constituents. On this question, therefore, I consider the most active influences will ever be the most successful.

Before you can succeed, in my judgment, you must reënforce the "right-of-way" members of the house with an active, interested, well-organized influence about the house. You must inspire your agents with an earnest, nay, an anxious wish for success. The rich reward of their labors must depend on success. Give them nothing if they fail — endow them richly if they succeed. This is, in brief space, the outline of my plans. Reason and justice are with you; an enlarged expediency favors your claim. You have able advocates, and the best of the argument; yet, with all these advantages, you have been defeated. I think I have pointed out the cause. Your opponents better understand the nature of the tribunal before which this vast interest is brought. They act on individuals of the body out of doors and in their chambers. Your adversaries are on the spot, and hover around the careless arbiters of the question in vigilant and efficient activity. The contest, as now waged, is most unequal. My plan would aim to place the "right-of-way" members on an equality with their adversaries, by sending down

27 *

a corps of agents, stimulated to an active partisanship by the strong lure of a high profit.

In considering the details of the plan, I would suggest that all practicable secrecy is desirable. It strikes me the company should have or know but one agent in the matter, and let that agent select the subagents from such quarters and classes, and in such numbers, as his discreet observation may dictate.

I contemplate the use of no improper means or appliances in the attainment of your purpose. My scheme is to surround the legislature with respectable and influential agents, whose persuasive arguments may influence the members to do you a naked act of justice. This is all. I require secrecy from motives of policy alone, because an open agency would furnish ground of suspicion and unmerited invective, and might weaken the impression we seek to make.

In regard to the cost of all this it must necessarily be great. The subagency must be extensive, and of first influence and character. All your agents must be inspired by an active zeal and a determined purpose of success. This can only be accomplished for you by offers of high contingent compensation.

I will illustrate this point by a single example. Were I to become your agent on my plan, I should like to have the services of Major Charles Hunton, of this county. Hunton, for many years, was a member of our State senate. His last year of service was as president of that body. He is an unpretending man, of good understanding and excellent address. He is a great favorite with his own party, (democratic,) and universally esteemed as a gentleman of highest character. He is in moderate circumstances, with a large family. I have no doubt, if I would bear his expenses, and secure him a contingent of one thousand dollars, he would spend the winter in Richmond, and do good service; but if I could offer him two thousand, it would become an object of great solicitude. It would pay all his debts and smooth the path of an advancing old age. Two thousand dollars would stimulate his utmost energies. If I am enabled to offer such inducements, I should have great confidence of success. Under this plan you pay nothing unless a law be passed which your company will accept. Of what value would such a law be to you? Measure this value, and let your own interests, in view of the high stake you play for, fix the price. There is no use in sending a boy on a man's errand; a low offer, and that contingent, is bad judgment; high service can't be had at a low bid.

I have surveyed the difficulties of this undertaking, and think they may be surmounted. The cash outlay for my own expenses, and those of the subagents, would be heavy. I know the

effective service of such agents as I would employ cannot be had except on a heavy contingent. Taking all things into view, I should not like to undertake the business on such terms, unless provided with a contingent fund of at least fifty thousand dollars, secured to my order on the passage of a law, and its acceptance by your company.

If the foregoing views are deemed worthy of consideration, I hold myself in readiness to meet any call in that behalf that may be made upon me. Respectfully, &c.

A. J. MARSHALL.

After the evidence had been closed, the counsel for the plaintiff asked the court to instruct the jury as follows:

1. That there is nothing in the terms or provisions of the agreement embraced in the resolution of the committee of correspondence, dated 12th December, 1846 (which is set forth in the opinion of the court) offered in evidence, which renders the same void, on grounds of public policy.

2. That the plaintiff is not precluded from recovering under the agreement aforesaid, dated 12th December, 1846, as modified by the agreement stated in the letter of 11th of February, 1847, by reason merely of the second proviso contained in the first section of the act of 6th of March, 1847, which has been offered in evidence, provided the jury shall find that the route, entering the ravine of the Ohio River at the mouth of Fish Creek, and running so as to pass from a point in the ravine of Buffalo Creek, at or near the mouth of Pile's Fork, to a depôt to be established by the defendant on the northern side of Wheeling Creek, in the city of Wheeling, upon minute estimates made in the manner and on the basis prescribed in said act, and made after full examination and instrumental surveys of the feasible or practicable routes, appeared to be the cheapest upon which to construct, maintain, and work said railroad; and provided they shall also find that the city of Wheeling did not agree to pay the difference of cost, as specified in said act, but on the contrary renounced the right to do so as early as the 10th of July, 1847; and provided they shall also find that said act was accepted by the stockholders of the defendant, as a part of its charter, on the 25th of August, 1847.

3. Upon the evidence aforesaid, the plaintiff prays the court to instruct the jury —

That if they find the contract contained in the resolution of the committee of correspondence of 12th of December, 1846, and in the resolution of the committee of correspondence of the 18th of January, 1847, and in the letter of Louis McLane of the 11th of February, 1847, aforesaid, to have been made with

the plaintiff by the defendant; and also that the act of Virginia of the 6th of March, 1847, was passed at the session of the Legislature of Virginia for 1846–1847, in the contract mentioned; and also that the Baltimore and Ohio Railroad, by the cheapest route to the city of Wheeling, entering the ravine of the Ohio at or north of Grave Creek, was ascertained, by such estimates as the law prescribed, to be more costly to construct, maintain, and work, than said road would be by the route passing into the ravine of the Ohio at or near the mouth of Fish Creek, and then to the city of Wheeling, and that the difference of said probable cost was then in like manner ascertained; that the defendants accepted the said law within six months from the passage thereof; and also, that when the difference of probable cost between said two routes was ascertained, according [to] said act, the city of Wheeling did not agree to pay to the defendant such difference of cost by the time specified in said act, and that the plaintiff did attend at Richmond during the session aforesaid, and did then and there superintend and further the applications and other proceedings to obtain the right of way through the State of Virginia, on behalf of the defendant, then the plaintiff is entitled to recover, on the special contract contained in the instrument aforesaid, the value of the contingent compensation therein stipulated.

And the defendants, by their counsel, prayed the court to instruct the jury that the plaintiff was not entitled to recover, because the contract, which stipulated for the payment of a contingent fee of fifty thousand dollars, in the event of the obtaining from the Legislature of Virginia such a law as is described therein, was against public policy, and void.

2. That if the jury shall believe that it was agreed between the parties to the said contract that the same should be kept secret, either in the terms of it or otherwise, from the Legislature of Virginia or the public, such contract, if otherwise proper and legal, was invalid as against public policy, and the plaintiff is not entitled to recover.

3. If the jury find that the special contract offered in evidence by the plaintiff was proposed to be entered into by plaintiff from the reasons and motives, and to be executed by him in the way suggested in his communication of the 17th of November, and its inclosure, offered in evidence by the defendant, (if the jury shall find that such communication was so made by plaintiff,) and if they shall find that the contract aforesaid was entered into accordingly, and that said contract, or plaintiff's agency under it, was not made known to the Legislature of Virginia, but in fact concealed, that then said contract was illegal and void, upon grounds of public policy.

Marshall *v*. Baltimore and Ohio Railroad Company.

4. That the contract between the plaintiff and defendants of 12th of December, 1846, looked to the obtaining of a law authorizing the defendants to extend their road through the State of Virginia, to a point on the Ohio River as low down the river as Fishing Creek, which law should be afterwards accepted by the defendants with a determination to act under it, or to the incorporation of an independent company, which the defendants should determine to accept and adopt, or of whose charter they should become the proprietors, authorizing the construction of a railroad from any point on the Ohio River between the mouth of Little Kenawha and Wheeling, and that no such law having been obtained, the plaintiff is not entitled to recover.

5. That the modified contract of the 11th of February looked to the obtaining of the passage of Hunter's substitute, with the adoption of Fish Creek instead of Fishing Creek, as the point of striking the Ohio. That the law which was passed on the 6th of March, 1847, was a law which did not, in its terms or effect, fulfil the stipulations of the modified agreement of February 11th, 1847.

6. That the acceptance of the law of March 6th, 1847, by the defendants, even supposing it to be substantially the same as Hunter's substitute, did not entitle the plaintiff to recover unless the jury should believe that such law was obtained through his agency, under the agreement with the defendants.

7. That even if the jury should believe that the law of March 6th, 1847, was obtained through the plaintiff's agency, the plaintiff is not entitled to recover if they shall believe that it was accepted by the defendants in consequence of the waiver, by the city of Wheeling, of the privileges accorded to it therein, and the stipulations contained in the agreement between the city of Wheeling and the defendants of March 6th, 1847.

8. That the modified agreement of February 11th, 1847, which made Hunter's substitute, modified as stated in the foregoing prayer, the standard of the law which was to be obtained to entitle the plaintiff to the stipulated compensation, made it necessary that such law should give to the defendants the absolute right to approach the city of Wheeling by way of Fish Creek; should release them from the necessity of continuing their road to Wheeling, unless the city should, within one year, or the citizens of Ohio county should, in the same time, subscribe one million dollars to the stock of the defendants; should enable the defendants to open and bring into use, as they progressed, the sections of their road as they were successively finished; and should authorize the defendants to charge, in proportion to distance, upon passengers and goods taken from Baltimore to Wheeling, should the road be continued to the

latter place; while the law that was actually passed made it the right of the defendants to take the Fish Creek route depend upon its being the cheapest, and even then placed the defendants' right to go to Fish Creek at the option of the city of Wheeling; made it imperative that Wheeling should be the terminus of the road, without any subscription on the part of herself or others; prevented the opening of any portion of her road west of Monongahela until the whole road could be opened to Wheeling, and obliged the defendant to charge no more for passengers or tonnage to Wheeling than they charged to a point five miles from the river; and that before the defendant accepted the law thus differing from that referred to in the modified agreement of February 11th, 1847, the city of Wheeling waived its control of the route, leaving it to depend upon 'ts comparative cost, agreed to subscribe five hundred thousand lollars to the stock of the defendants, and provided a depot for .he defendants at the terminus of the road; and that the adopion and acceptance of the law of March the 6th, 1847, thus liffering from Hunter's substitute, and induced by the waiver md stipulation of Wheeling, already mentioned, and action ınder it, was not such an acceptance, adoption, and action, as entitled the plaintiff to recover.

9. That if the jury shall believe that the plaintiff received from the defendants the six hundred dollars given in evidence in full discharge of his claims for compensation under the agreement in question, then the plaintiff is not entitled to recover.

But the court refused to give the instructions as prayed, by either plaintiff or defendant, but instructed the jury as follows:

1. If at the time the special contract was made, upon which this suit is brought, it was understood between the parties that the services of the plaintiff were to be of the character and description set forth in his letter to the president of the railroad company, dated November 17, 1846, and the paper therein inclosed, and that, in consideration of the contingent compensation mentioned in the contract, he was to use the means and influences proposed in his letter and the accompanying paper, for the purpose of obtaining the passage of the law mentioned in the agreement, the contract is against the policy of the law, and no action can be maintained.

2. If there was no agreement between the parties that the services of the plaintiff should be of the character and description mentioned in his letter and communication referred to in the preceding instruction, yet the contract is against the policy of the law, and void, if at the time it was made the parties agreed to conceal from the members of the Legislature of Virginia the fact that the plaintiff was employed by the defendant.

as its agent, to advocate the passage of the law it desired to obtain, and was to receive a compensation, in money, for his services in case the law was passed by the legislature at the session referred to in the agreement.

3. And if there was no actual agreement to practise such concealment, yet he is not entitled to recover if he did conceal from the members of the legislature, when advocating the passage of the law, that he was acting as agent for the defendant, and was to receive a compensation, in money, in case the law passed.

4. But if the law was made upon a valid and legal consideration, the contingency has not happened upon which the sum of fifty thousand dollars was to be paid to the plaintiff — the law passed by the legislature of Virginia being different, in material respects, from the one proposed to be obtained by the defendant by the agreement of February 11th, 1847; and the passage of which, by the terms of that contract, was made a condition precedent to the payment of the money.

5. The subsequent acceptance of the law as passed, under the agreement with the city of Wheeling, stated in the evidence, was not a waiver of the condition, and does not entitle the plaintiff to recover in an action on the special contract.

6. There is no evidence that the plaintiff rendered any services, or was employed to render any, under any contract, express or implied, except the special contract stated in his declaration; and as no money is due to him under that contract, he cannot recover upon the count upon a *quantum meruit.*

And thereupon the plaintiff excepts, as well to the refusal of his prayers as to the granting of the instructions aforesaid given; and tenders this his second bill of exceptions, and prays that the same may be signed and sealed by the court, which is accordingly done          day of November, 1852.

R. B. TANEY. [SEAL.]

The first bill of exceptions was to the admissibility of the evidence above mentioned.

Upon these two exceptions the case came up to this court.

It was argued by *Mr. Davis* and *Mr. Schley*, for the plaintiff in error, and by *Mr. Latrobe* and *Mr. Johnson*, for the defendants in error.

All the points, on either side, relating to the particular route to be attained, are omitted, because it would be impossible to explain them without maps and minute geographical details.

With respect to the three first instructions, the counsel for the plaintiff in error contended:

1. That the first instruction is erroneous — because

*a.* There is no proof of any understanding between the parties at the time of the contract, that the services were to be of the nature mentioned in the paper No. 1.

*b.* No service is proposed in paper No. 1, which is against the policy of the law, if the paper be fairly construed.

The paper describes the characters of the members, the conduct of the opponents of the company in influencing them, and the necessity of a counteracting influence out of doors; but it expressly disclaims all improper means and appliances, and the proposal is confined to " surrounding the legislature with respectable and influential agents, whose persuasive arguments may influence the members to do you a naked act of justice."

*c.* Even if the paper be open to a doubt, the law resolves that doubt against the conclusion of illegality, as well in object as in means. Lewis *v.* Davison, 4 M. & W. 654.

2. That the second instruction is erroneous — because

*a.* There is no proof of any agreement at the time of the contract for the concealment of the agency of the plaintiff from the members of the legislature.

*b.* There is no difference between the obligation of an agent to procure a law and an agent for any other purpose legal in itself; and the law does not avoid a contract of agency because it is to be kept secret.

3. That the third instruction is erroneous — because

*a.* There is no proof of any actual concealment.

*b.* In the absence of proof of disclosure, the law does not presume concealment.

*c.* The proof is that, in point of fact, the agency was so conducted as to be apparent to the members of the legislature without being in words disclosed.

*d.* It is proved that it was expressly disclosed both by the plaintiff and the company.

*e.* But in the absence of any agreement or understanding as to concealment, which is the hypothesis of the instruction, it is clearly erroneous to avoid the contract at the instance of the company for the failure of the plaintiff to disclose his agency. That is to avoid the contract at the instance of the defendants by matter subsequent entirely foreign to it.

*f.* The law does not require disclosure of an agency as a condition precedent to the right of the agent to recover from the principal.

And, upon these points, the counsel referred to the following authorities: Davis *v.* Bank of Eng. 2 Bing. 393; Richardson *v.* Millish, 2 Bing. 229; Harrington *v.* Kloprogge, 4 Doug. 5; Stiles *v.* Causten, 2 G. & J. 49; Kalkman *v.* Causten, 2 G. & J. 357; Fishmonger Co. *v.* Robertson, 5 Mann. & Gr. 131; Howdon *v.*

Simpson, 10 Ad. & Ellis, 793, 800, and on appeal, 9 Cl. & Fin. 61; Wood v. McCann, 6 Dana, 366; Hunt v. Test, 8 Alab. 713; Edwards v. Gr. J. R. R. Co. 7 Sim. 337, and on appeal, 1 M. & Cr. 65; Vauxhall Br. Co. v. Spencer, 2 Madd. 356; Jacob, 64.

Upon the principal point in the case, namely, that the contract was against public policy, and therefore void, the counsel for the defendant in error cited the following authorities: Hunt v. Test, 8 Alabama, 713; Hatzfeld v. Gulden, 7 Watts, 152; Clippinger v. Hepbaugh, 5 Watts & Sergt. 315; Wood v. McCann, 6 Dana, 366; Fuller v. Dame, 18 Pick. 472.

Mr. Justice GRIER delivered the opinion of the court.

A question, necessarily preliminary to our consideration of the merits of this case, has been brought to the notice of the court, though not argued or urged by the counsel.

The plaintiff in error, who was also plaintiff below, avers in his declaration that he is a citizen of Virginia, and that " The Baltimore and Ohio Railroad Company, the defendant, is a body corporate by an act of the General Assembly of Maryland." It has been objected, that this averment is insufficient to show jurisdiction in the courts of the United States over the " suit " or " controversy." The decision of this court in the case of the Louisville Railroad v. Letson, 2 Howard, 497, it is said, does not sanction it, or if some of the doctrines advanced should seem so to do, they are extrajudicial, and therefore not authoritative.

The published report of that case (whatever the fact may have been) exhibits no dissent to the opinion of the court by any member of it. It has, for the space of ten years, been received by the bar as a final settlement of the questions which have so frequently arisen under this clause of the Constitution; and the practice and forms of pleading in the courts of the United States have been conformed to it. Confiding in its stability, numerous controversies involving property and interests to a large amount, have been heard and decided by the circuit courts, and by this court; and many are still pending here, where the jurisdiction has been assumed on the faith of the sufficiency of such an averment. If we should now declare these judgments to have been entered without jurisdiction or authority, we should inflict a great and irreparable evil on the community. There are no cases, where an adherence to the maxim of " *stare decisis* " is so absolutely necessary to the peace of society, as those which affect retroactively the jurisdiction of courts. For this reason alone, even if the court were now of opinion that the principles affirmed in the case just mentioned, and that of

The Bank *v.* Deveaux, 5 Cranch, 61, were not founded on right reason, we should not be justified in overruling them. The practice founded on these decisions, to say the least, injures or wrongs no man; while their reversal could not fail to work wrong and injury to many.

Besides the numerous cases, with similar averments, over which the court have exercised jurisdiction without objection, we may mention that of Rundle *v.* The Delaware and Raritan Canal, 14 Howard, 80, as one precisely in point with the present. The report of that case shows that the question of jurisdiction, though not noticed in the opinion of the court, was not overlooked, three of the judges having severally expressed their opinion upon it. Its value as a precedent is therefore not merely negative. But as we do not rely only on precedent to justify our conclusion in this case, it may not be improper, once again, to notice the argument used to impugn the correctness of our former decisions, and also to make a brief statement of the reasons which, in our opinion, fully vindicate their propriety.

By the Constitution, the jurisdiction of the courts of the United States is declared to extend, *inter alia*, to " controversies between citizens of different States." The Judiciary Act confers on the circuit courts jurisdiction " in suits between a citizen of the State where the suit is brought and a citizen of another State."

The reasons for conferring this jurisdiction on the courts of the United States, are thus correctly stated by a contemporary writer (Federalist, No. 80.) " It may be esteemed as the basis of the Union, ' that the citizens of each State shall be entitled to all the privileges and immunities of the citizens of the several States.' And if it be a just principle, that every government ought to possess the means of executing its own provisions by its own-authority, it will follow, that in order to the inviolable maintenance of that equality of privileges and immunities, the national judiciary ought to preside in all cases, in which one State or its citizens are opposed to another State or its citizens."

Now, if this be a right, or privilege guaranteed by the Constitution to citizens of one State in their controversies with citizens of another, it is plain that it cannot be taken away from the plaintiff by any legislation of the State in which the defendant resides. If A, B, and C, with other dormant or secret partners, be empowered to act by their representatives, to sue or to be sued in a collective or corporate name, their enjoyment of these privileges, granted by State authority, cannot nullify this important right conferred on those who contract with them. It was

well remarked by Mr. Justice Catron, in his opinion delivered in the case of Rundle, already referred to, that "if the United States courts could be ousted of jurisdiction, and citizens of other States be forced into the State courts, without the power of election, they would often be deprived, in great cases, of all benefit contemplated by the Constitution; and in many cases be compelled to submit their rights to judges and juries who are inhabitants of the cities where the suit must be tried, and to contend with powerful corporations, where the chances of impartial justice would be greatly against them; and where no prudent man would engage with such an antagonist, if he could help it. State laws, by combining large masses of men under a corporate name, cannot repeal the Constitution. All corporations must have trustees and representatives who are usually citizens of the State where the corporation is created: and these citizens can be sued, and the corporate property charged by the suit. Nor can the courts allow the constitutional security to be evaded by unnecessary refinements, without inflicting a deep injury on the institutions of the country."

Let us now examine the reasons which are considered so conclusive and imperative, that they should compel the court to give a construction to this clause of the Constitution, practically destructive of the privilege so clearly intended to be conferred by it.

"A corporation, it is said, is an artificial person, a mere legal entity, invisible and intangible."

This is no doubt metaphysically true in a certain sense. The inference, also, that such an artificial entity "cannot be a citizen" is a logical conclusion from the premises which cannot be denied.

But a citizen who has made a contract, and has a "controversy" with a corporation, may also say, with equal truth, that he did not deal with a mere metaphysical abstraction, but with natural persons; that his writ has not been served on an imaginary entity, but on men and citizens; and that his contract was made with them as the legal representatives of numerous unknown associates, or secret and dormant partners.

The necessities and conveniences of trade and business require that such numerous associates and stockholders should act by representation, and have the faculty of contracting, suing, and being sued in a factitious or collective name. But these important faculties, conferred on them by State legislation, for their own convenience, cannot be wielded to deprive others of acknowledged rights. It is not reasonable that those who deal with such persons should be deprived of a valuable privilege by a syllogism, or rather sophism, which deals subtly with

words and names, without regard to the things or persons they are used to represent.

Nor is it reasonable that representatives of numerous unknown and ever-changing associates should be permitted to allege the different citizenship of one or more of these stockholders, in order to defeat the plaintiff's privilege. It is true that these stockholders are corporators, and represented by this "juridical person," and come under the shadow of its name. But for all the purposes of acting, contracting, and judicial remedy, they can speak, act, and plead, only through their representatives or curators. For the purposes of a suit or controversy, the persons represented by a corporate name can appear only by attorney, appointed by its constitutional organs. The individual or personal appearance of each and every corporator would not be a compliance with the exigency of the writ of summons or distringas. Though, nominally, they are not really parties to the suit or controversy. In courts of equity, where there are very numerous associates having all the same interest, they may plead and be impleaded through persons representing their joint interests; and, as in the case between the northern and southern branches of the Methodist Church, lately decided by this court, the fact that individuals adhering to each division were known to reside within both States of which the parties to the suit were citizens, was not considered as a valid objection to the jurisdiction.

In courts of law, an act of incorporation and a corporate name are necessary to enable the representatives of a numerous association to sue and be sued. "And this corporation can have no legal existence out of the bounds of the sovereignty by which it is created. It exists only in contemplation of law and by force of the law; and where that law ceases to operate the corporation can have no existence. It must dwell in the place of its creation." Bank of Augusta v. Earle, 13 Pet. 512. The persons who act under these faculties, and use this corporate name, may be justly presumed to be resident in the State which is the necessary *habitat* of the corporation, and where alone they can be made subject to suit; and should be estopped in equity from averring a different domicil as against those who are compelled to seek them there, and can find them there and nowhere else. If it were otherwise it would be in the power of every corporation, by electing a single director residing in a different State, to deprive citizens of other States with whom they have controversies, of this constitutional privilege, and compel them to resort to State tribunals in cases in which, of all others, such privilege may be considered most valuable.

But it is contended that, notwithstanding the court in deciding the question of jurisdiction, will look behind the corporate

or collective name given to the party, to find the persons who act as the representatives, curators, or trustees, of the association, stockholders, or *cestui que trusts*, and in such capacity are the real parties to the controversy; yet that the declaration contains no sufficient averment of their citizenship. Whether the averment of this fact be sufficient in law, is merely a question of pleading. If the declaration sets forth facts from which the citizenship of the parties may be presumed or legally inferred, it is sufficient. The presumption arising from the habitat of a corporation in the place of its creation being conclusive as to the residence or citizenship of those who use the corporate name and exercise the faculties conferred by it, the allegation that the " defendants are a body corporate by the act of the General Assembly of Maryland," is a sufficient averment that the real defendants are citizens of that State. This form of averment has been used for many years. Any established form of words used for the expression of a particular fact, is a sufficient averment of it in law. In the case of Gassies v. Ballon, 6 Pet. 761, the petition alleged that "the defendant had caused himself to be naturalized an American citizen, and that he was at the time of filing the petition residing in the parish of West Baton Rouge." This was held to be a sufficient averment that he was a citizen of the State of Louisiana. And the court say, " a citizen of the United States residing in any State of the Union, is a citizen of that State." They also express their regret that previous decisions of this court had gone so far in narrowing and limiting the rights conferred by this article of the Constitution. And we may add, that instead of viewing it as a clause conferring a privilege on the citizens of the different States, it has been construed too often, as if it were a penal statute, and as if a construction which did not adhere to its very letter without regard to its obvious meaning and intention, would be a tyrannical invasion of some power supposed to be secured to the States or not surrendered by them.

The right of choosing an impartial tribunal is a privilege of no small practical importance, and more especially in cases where a distant plaintiff has to contend with the power and influence of great numbers and the combined wealth wielded by corporations in almost every State. It is of importance also to corporations themselves that they should enjoy the same privileges, in other States, where local prejudices or jealousy might injuriously affect them.

With these remarks on the subject of jurisdiction we will now proceed to notice the various exceptions to the rulings of the court on the trial.

The declaration, besides a count for work and labor done and

services rendered in procuring certain legislation in Virginia, demands the sum of fifty thousand dollars on a special contract made with the defendants, through a committee of the board of directors, dated 12th of December, 1846, as follows:

" On motion, it was resolved, that the President be, and is hereby authorized, in addition to the agent heretofore employed by the committee for the same purpose, to employ and make arrangements, with other responsible persons, to attend at Richmond during the present session of the legislature, in order to superintend and further any application or other proceeding to obtain the right of way through the State of Virginia, on behalf of this company, and to take all proper measures for that purpose; that he also be authorized to agree with such agent or agents, in case a law shall be obtained from the said legislature, during its present session, authorizing the company to extend their road through that State to a point on the Ohio River as low down the river as Fishing Creek; and the stockholders of this company shall afterwards accept such law as may be obtained, and determine to act under it; or, in case a law should be passed authorizing the construction of a railroad from any point on the Ohio River above the mouth of the Little Kenawha and below the city of Wheeling, with authority to intersect with the present Baltimore and Ohio Railroad; and the stockholders of the Baltimore and Ohio Railroad Company shall determine to accept and adopt said law, or shall become the proprietors thereof, and prosecute their road according to its provisions, then, in either of the said cases, the president shall be and is authorized to pay to the agent or agents whom he may employ in pursuance of this resolution, the sum of fifty thousand dollars, in the six per cent. bonds of this company, at their par value, and to be made payable at any time within the period of five years. Resolved, That it shall be expressly stipulated in the agreement with the said agent or agents employed pursuant to this resolution, and as a condition thereof, that if no such law as aforesaid shall pass, or if any law that may be passed shall not be accepted, or adopted, or used by the stockholders, the said agents shall not be entitled to receive any compensation whatever for the service they may render in the premises, or for any expense they may incur in obtaining such law or otherwise."

And also the following resolution of January 18th, 1847:

" On motion it was unanimously resolved, that the right of Mr. Marshall to the compensation under the existing contract shall attach upon the passage of a law at the present session of the legislature, giving the right of way to Parkersburg or to Fishing Creek, either to the Baltimore and Ohio Railroad Company, or to an independent company: Provided this company

accept the one, and adopt and act under the other, as contemplated by the contract."

And also a letter from the president of the company, of February 11th, 1847, containing a further modification of the terms as exhibited in the following extract:

" In this crisis, if after the utmost exertion nothing better can be done, if it were practicable to pass Mr. Hunter's substitute with Fish Creek instead of Fishing Creek, we would not undertake to prevent the passage of such a law. We would then refer the whole question to the stockholders; and I am authorized to say that, every thing else failing, if such a law as is indicated pass, and the stockholders adopt it and act under it in the manner contemplated by the contract, your compensation shall apply to that as to any other aspect of the case."

The defendants gave notice of the following grounds of defence, as those upon which they intended to rely:

" 1. That the agreement sought to be enforced by the plaintiff, admitting his ability to make it out by legal proof to the extent of his pretensions, was an agreement contrary to the policy of the law, and which cannot be sustained.

" 2. That, admitting the said agreement to be a valid one, which the courts would enforce, yet the plaintiff is not entitled to recover, because he failed to accomplish the object for which it was entered into.

" 3. That the law of Virginia, which was accepted by the defendants after it had been modified by the waiver of the city of Wheeling, as mentioned in the plaintiff's notice, was not obtained through the efforts of the plaintiff, but against his strenuous opposition, and furnishes him no ground for his present claim.

" 4. That there was a final settlement between the plaintiff and defendants, after the passage of the Virginia law aforesaid, which concludes him on this behalf."

On the trial the plaintiff, after giving in evidence the contract as above stated, produced various letters and documents tending to show the measures pursued, and their result — a particular recapitulation of these facts is not necessary, and would encumber the case. A very brief outline will suffice to an understanding of the points to be considered.

It appears that the defendants were desirous to obtain, from the Legislature of Virginia, the grant of a right of way so as to strike the Ohio River as low down as possible in view of a connection from thence towards Cincinnati. It was the interest of the people of Wheeling to prevent, if possible, the terminus o the road on the Ohio from being anywhere else but at their city. In the winter of 1846 – 7 the antagonist parties came into

collision again before the Legislature of Virginia, at Richmond. In this contest the plaintiff acted as general agent of the defendants, under the contract in question. The bills granting the desired franchise to the defendants were defeated in every form proposed by them, and a substitute, altered and amended to suit the interests of Wheeling, was finally passed in face of the strenuous opposition of the defendants.

The plaintiff afterwards admitted his defeat, and want of success in fulfilling the conditions of his contract. He at the same time demanded and received the sum of six hundred dollars for expenses of agents, &c. But as Wheeling and defendants both desired the extension of the road to the Ohio, they finally agreed to a compromise, modifying the operation of the act under which the road has since been completed.

The defendants then offered in evidence, in support of their defence, on the ground of illegality of the contract, a letter from the plaintiff to the president of the board, dated 17th November, 1846, with an accompanying document, in which plaintiff proposes himself as agent, and states his terms; and the course he advises to be pursued, and the means to be used to ensure success; and also a letter from the president in answer thereto, stating his inability to act on his individual responsibility, and inviting an interview; together, also, with a letter from the same, dated 12th of December, in which he says: "I am now prepared to close an arrangement with you on the basis of your communication of the 17th of November."

The plaintiff's objection to the admission of these documents in evidence, and the reception of them, form the subject of the first bill of exceptions.

In order to judge of the competency and relevancy of these documents to the issue in the case, it will be necessary to give a brief statement of some portion of their contents.

The letter of November 17th commences by referring to a former interview and a promise to submit a plan, in writing, by which it was supposed the much desired right of way through Virginia might be procured from the legislature. It proposes that the writer should be appointed, as agent of the company, to manage "the delicate and important trust." It states that, as the business required "absolute secrecy," he could not safely get testimonials as to his qualifications; but that he had "considerable experience as a lobby member" before the legislature of Virginia, and could allege "an ostensible reason" for his presence in Richmond, and his active interference, without disclosing his real character and object.

The accompanying document explains the cause of previous failures, and shows what remedy or counteracting influence

should be employed. It announces that "log-rolling" was the principal measure used to defeat them before. That it has grown into a system; that however "skilful and unscrupulous" the friends of defendants may have been in this respect, still their opponents had got the advantage, being present on the ground, and "using out-door influence." That it was necessary to meet their opponents with their own weapons. That the mass of the members of the legislature were "careless and good natured," and "engaged in idle pleasures," capable of being "moulded like wax" by the "most pressing influences." That, to get the vote of this careless mass, "efficient means" must be adopted. That through their "kind and social dispositions" they may be approached and influenced to do any thing not positively wrong, "where they can act without fear of their constituents." That to the accomplishment of success it was necessary to have "an active, interested, and well organized influence about the house." That these agents "must be inspired with an earnest, nay, anxious wish for success," "and have their whole reward depending on it." "Give them nothing if they fail, endow them richly if they succeed." "Stimulate them to active partisanship by the strong lure of high profit."

That, in order to the "requisite secrecy," the company should know but one agent, and he select the others; that the cost of all this will "necessarily be great," as the result can be obtained "only by offers of high contingent compensation;" that "high services cannot be had at a low bid," and that he would not be willing to undertake the business unless "provided with a fund of at least $50,000."

As the contract was made "on the basis of this communication," there can be no doubt as to its legal competence as evidence to show the nature and object of the agreement. As parts of one and the same transaction, they may be considered as incorporated in the contract declared on. The testimony is therefore competent. Is it relevant?

As the first three propositions, contained in the charge of the court, have reference to the question of the relevancy of this matter to the issues, they may well be considered together. They are as follows:

"1. If at the time the special contract was made, upon which this suit is brought, it was understood between the parties that the services of the plaintiff were to be of the character and description set forth in his letter to the president of the railroad company, dated November 17th, 1846, and the paper therein inclosed, and that, in consideration of the contingent compensation mentioned in the contract, he was to use the means and influences proposed in his letter and the accompanying paper,

for the purpose of obtaining the passage of the law mentioned in the agreement, the contract is against the policy of the law, and no action can be maintained.

"2. If there was no agreement between the parties that the services of the plaintiff should be of the character and description mentioned in his letter and communication referred to in the preceding instruction, yet the contract is against the policy of the law, and void, if at the time it was made the parties agreed to conceal from the members of the Legislature of Virginia the fact that the plaintiff was employed by the defendant, as its agent, to advocate the passage of the law it desired to obtain, and was to receive a compensation, in money, for his services, in case the law was passed by the legislature at the session referred to in the agreement.

"3. And if there was no actual agreement to practise such concealment, yet he is not entitled to recover if he did conceal from the members of the legislature, when advocating the passage of the law, that he was acting as agent for the defendant, and was to receive a compensation, in money, in case the law passed."

It is an undoubted principle of the common law, that it will not lend its aid to enforce a contract to do an act that is illegal; or which is inconsistent with sound morals or public policy; or which tends to corrupt or contaminate, by improper influences, the integrity of our social or political institutions. Hence all contracts to evade the revenue laws are void. Persons entering into the marriage relation should be free from extraneous or deceptive influences; hence the law avoids all contracts to pay money for procuring a marriage. It is the interest of the State that all places of public trust should be filled by men of capacity and integrity, and that the appointing power should be shielded from influences which may prevent the best selection; hence the law annuls every contract for procuring the appointment or election of any person to an office. The pardoning power, committed to the executive, should be exercised as free from any improper bias or influence as the trial of the convict before the court; consequently, the law will not enforce a contract to pay money for soliciting petitions or using influence to obtain a pardon. Legislators should act from high considerations of public duty. Public policy and sound morality do therefore imperatively require that courts should put the stamp of their disapprobation on every act, and pronounce void every contract the ultimate or probable tendency of which would be to sully the purity or mislead the judgments of those to whom the high trust of legislation is confided.

All persons whose interests may in any way be affected by

any public or private act of the legislature, have an undoubted right to urge their claims and arguments, either in person or by counsel professing to act for them, before legislative committees, as well as in courts of justice. But where persons act as counsel or agents, or in any representative capacity, it is due to those before whom they plead or solicit, that they should honestly appear in their true characters, so that their arguments and representations, openly and candidly made, may receive their just weight and consideration. A hired advocate or agent, assuming to act in a different character, is practising deceit on the legislature. Advice or information flowing from the unbiased judgment of disinterested persons, will naturally be received with more confidence and less scrupulously examined than where the recommendations are known to be the result of pecuniary interest, or the arguments prompted and pressed by hope of a large contingent reward, and the agent "stimulated to active partisanship by the strong lure of high profit." Any attempts to deceive persons intrusted with the high functions of legislation, by secret combinations, or to create or bring into operation undue influences of any kind, have all the injurious effects of a direct fraud on the public.

Legislators should act with a single eye to the true interest of the whole people, and courts of justice can give no countenance to the use of means which may subject them to be misled by the pertinacious importunity and indirect influences of interested and unscrupulous agents or solicitors.

Influences secretly urged under false and covert pretences must necessarily operate deleteriously on legislative action, whether it be employed to obtain the passage of private or public acts. Bribes, in the shape of high contingent compensation, must necessarily lead to the use of improper means and the exercise of undue influence. Their necessary consequence is the demoralization of the agent who covenants for them; he is soon brought to believe that any means which will produce so beneficial a result to himself are "proper means;" and that a share of these profits may have the same effect of quickening the perceptions and warming the zeal of influential or "careless" members in favor of his bill. The use of such means and such agents will have the effect to subject the State governments to the combined capital of wealthy corporations, and produce universal corruption, commencing with the representative and ending with the elector. Speculators in legislation, public and private, a compact corps of venal solicitors, vending their secret influences, will infest the capital of the Union and of every State, till corruption shall become the normal condition of the body politic, and it will be said of us as of Rome — "*omne Romæ venale.*"

That the consequences we deprecate are not merely visionary, the act of Congress of 1853, c. 81, "to prevent frauds upon the treasury of the United States" may be cited as legitimate evidence. This act annuls all champertous contracts with agents of private claims.

2d. It forbids all officers of the United States to be engaged as agents or attorneys for prosecuting claims or from receiving any gratuity or interest in them in consideration of having aided or assisted in the prosecution of them, under penalty of fine and imprisonment in the penitentiary.

3d. It forbids members of Congress, under a like penalty, from acting as agents for any claim in consideration of pay or compensation, or from accepting any gratuity for the same.

4th. It subjects any person who shall attempt to bribe a member of Congress to punishment in the penitentiary, and the party accepting the bribe to the forfeiture of his office.

If severity of legislation be any evidence of the practice of the offences prohibited, it must be the duty of courts to take a firm stand, and discountenance, as against the policy of the law, any and every contract which may tend to introduce the offences prohibited.

Nor are these principles now advanced for the first time. Whenever similar cases have been brought to the notice of courts they have received the same decision.

Without examining them particularly, we would refer to the cases of Fuller *v*. Dame, 18 Pick. 470; Hatzfield *v*. Gulden, 7 Watts, 152; Clippinger *v*. Hepbaugh, 5 Watts & Sergt. 315; Wood *v*. McCan, 6 Dana, 366; and Hunt *v*. Test, 8 Alabama, 719. The Commonwealth *v*. Callaghan, 2 Virginia Cases, 460.

The sum of these cases is.— 1st. That all contracts for a contingent compensation for obtaining legislation, or to use personal or any secret or sinister influence on legislators, is void by the policy of the law.

2d. Secrecy, as to the character under which the agent or solicitor acts, tends to deception, and is immoral and fraudulent; and where the agent contracts to use secret influences, or voluntarily, without contract with his principal, uses such means, he cannot have the assistance of a court to recover compensation.

3d. That what, in the technical vocabulary of politicians is termed "log-rolling," is a misdemeanor at common law, punishable by indictment.

It follows, as a consequence, that the documents given in evidence under the first bill of exceptions were relevant to the issue; and that the court below very properly gave the instructions under consideration.

We now come to the last three exceptions to the instructions of the court, which were as follows:

"4. But if the contract was made upon a valid and legal consideration, the contingency has not happened upon which the sum of fifty thousand dollars was to be paid to the plaintiff — the law passed by the legislature of Virginia being different, in material respects, from the one proposed to be obtained by the defendant by the agreement of February 11th, 1847; and the passage of which, by the terms of that contract, was made a condition precedent to the payment of the money."

"5. The subsequent acceptance of the law as passed, under the agreement with the city of Wheeling, stated in the evidence, was not a waiver of the condition, and does not entitle the plaintiff to recover in an action on the special contract."

"6. There is no evidence that the plaintiff rendered any services, or was employed to render any, under any contract, express or implied, except the special contract stated in his declaration; and as no money is due to him, under that contract, he cannot recover upon the count of *quantum meruit.*"

We do not think it necessary, in order to justify these instructions of the court below, or to vindicate our affirmance of them, to enter into a long and perplexed history of the various schemes of legislative action, and their results, as exhibited by the testimony in the case. It would require a map of the country, and tedious and prolix explanations. Suffice it to say, that after a careful examination of the admitted facts of the case, we are fully satisfied of the correctness of the instructions.

1. Because the plaintiff, by his own showing, had not performed the conditions which entitled him to demand this stipulated compensation.

2. The act of assembly which was passed, and afterwards used by defendant for want of better, was obtained by the opponents of defendants, and in spite of the opposition of plaintiff; and the fact that the company were compelled to accept the act under modifications, by compromise with their opponents, would not entitle plaintiff to his stipulated reward.

3. By the stipulations of his contract he is estopped from claiming under a *quantum meruit*, as his whole compensation depended on success in obtaining certain specified legislation, which he acknowledged he had failed to achieve.

The judgment of the Circuit Court is therefore affirmed, with costs.

Mr. Justice Catron, Mr. Justice Daniel, and Mr. Justice Campbell, dissented.

Mr. Justice CATRON said that he concurred with his bro-

ther, Mr. Justice Campbell, in the opinion which he was about to pronounce, and had authorized him so to state. But inasmuch as reference had been made in the opinion of the court, which had just been delivered, to an opinion which he himself had given in the case of Rundle v. the Delaware and Raritan Canal Company, 14 Howard, 80, he felt it to be a duty to himself to remark, that he had at all times denied that a corporation is a citizen within the sense of the Constitution, and so he had declared in the opinion just referred to. He had there stated the necessity of the existence of jurisdiction in the federal courts as against corporations, but held that citizenship of the president and directors must be averred to be of a different State from the other party to the suit; without which averment, this court could not proceed, according to the settled practice of fifty years standing. Letson's case (which is the foundation of the new doctrine) contained the necessary averment within the settled practice, and consequently it was not necessary to give a separate opinion in that case.

He remarked, further, that according to the assumption that a corporation was a citizen of the State where it was incorporated, a company having a charter for a railroad in two States (and there were many such) might sue citizens of the State and place where the president and directors resided, averring that the company was a citizen of the other State, and *vice versa*. In such case the corporation could sue in every federal court in the Union.

Mr. Justice DANIEL.

From the opinion just delivered I must declare my dissent. In the settlement of the discreditable controversy between the parties to this cause, I take no part. If I did, I should probably say that it is a case without merits, either in the plaintiff or in the defendants, and that in such a case they should be dismissed by courts of justice to settle their dispute by some standard which is cognate to the transaction in which they have been engaged.

My participation in this case has reference to a far different and more important ingredient involved in the opinion just announced, namely, the power of this court to adjudicate this cause consistently, with a just obedience to that authority from which, and from which alone, their being and their every power are derived.

Having in former instances, and particularly in the case of the Rundle v. Delaware and Raritan Canal Company, endeavored to expose the utter want of jurisdiction in the courts of the United States over causes in which corporations shall be parties

either as plaintiffs or defendants, I hold it to be unnecessary in this place to repeat or to enlarge upon the positions maintained in the case above mentioned, as they are presented in 14 Howard, 95. Indeed, from any real necessity for enforcing the general fundamental proposition contended for by me in the case of Rundle and the Delaware and Raritan Canal Company, namely, that under the second section of the third article of the Constitution, citizens only, that is to say men, material, social, moral, sentient beings, must be parties, in order to give jurisdiction to the federal courts, I am wholly relieved by the virtual, obvious, and inevitable concessions, comprised in the attempt now essayed, to carry the provision of the Constitution beyond either its philological, technical, political, or vulgar acceptation. For in no one step in the progress of this attempt, is it denied that a corporation is not and cannot be a citizen, nor that a citizen does not mean a corporation, nor that the assertion of a power by an individual outside of the corporation, and interfering with and controlling its organization and functions, (whatever might be the degree of interest owned by that individual in the corporation,) would be incompatible with the existence of the corporate body itself. Nothing of this kind is attempted. But an effort is made to escape from the effect of these concessions, by assumptions which leave them in all their force, and show that such concessions and assumptions cannot exist in harmony with each other.

Thus it has been insisted that a corporation, created by a State, can have no being or faculties beyond the limits of that State; and if its president and officers reside within that State such a conjuncture will meet and satisfy the predicament laid down by the Constitution.

The want of integrity, in this argument, is exposed by the following questions:

1. Does the restriction of the corporate body within particular geographical limits, or the residence of its officers within those limits, render it less a corporation, or alter its nature and legal character in any degree?

2. Does the restriction of the corporate faculties within given bounds, necessarily or by any reasonable presumption, imply that the interest of its stockholders, either in its property or its acts, is confined to the same limits? If it does, then a change of residence by officers, agents, or stockholders, or a transfer of a portion of the interests of the latter, would destroy the qualification of citizenship depending upon locality. If it would not have this effect, then this anomalous citizen may possess the rights of both plaintiff and defendant, nay, by a sort of plural being or ubiquity, may be a citizen of every State in the Union,

may even be a State and a citizen of the same State at the same time.

Again it has been said, that the Constitution has reference merely to the interests of those who may have access to the federal courts; and that provided those interests can be traced, or presumed to have existence in persons lesiding in different States, it cannot be required that those by whom such interests are legally held and controlled, or represented, should be alleged or proved to be citizens, or should appear in that character as parties upon the record.    In reply to this proposition it may be asked, upon what principle any one can be admitted into a court of justice apart from the interest he may possess in the matter in controversy; and whether it is not that interest alone and the position he holds in relation thereto, which can give him access to any court?  But, again, the language of the Constitution refers expressly and conclusively to the civil or political character of the party litigant, and constitutes that character the test of his capacity to sue or be sued in the courts of the United States.

In strict accordance with this doctrine has been the interpretation of the Constitution from the early, and what may in some sense be called the cotemporaneous interpretation of that instrument, an interpretation handed down in an unbroken series of decisions, until crossed and disturbed by the anomalous ruling in the case of Letson *v.* The Louisville Railroad Company.

Beginning with the case of Bingham *v.* Cabot, in the 3d of Dallas, 382, and running through the cases of Turner *v.* The Bank of North America, 4 Dallas, 8; Turner's Admr. *v.* Enrille, Ib. 7; Mossman *v.* Higginson, Ib. 12; Abercrombie *v.* Dupuis, 1 Cranch, 343; Wood *v.* Wagnon, 2 Ib. 1; Capron *v.* Van Noorden, 2 Ib. 126; Strawbridge *v.* Curtis, 3 Ib. 267; The Bank of the United States *v.* Deveaux, 5 Ib. 61; Hodgson *v.* Bowerbank, 5 Ib. 303; The Corporation of New Orleans *v.* Winter, 1 Wheat. 91; Sullivan *v.* The Fulton Steamboat Company, 6 Wheat. 450 — the doctrine is ruled and reiterated, that in order to maintain an action in the courts of the United States, under the clause in question, not only must the parties be citizens of different States, but that this character must be averred explicitly, and must appear upon the record, and cannot be inferred from residence or locality, however expressly stated, and that the failure to make the required averment will be fatal to the jurisdiction of a federal court, either original or appellate; and is not cured by the want of a plea or of a formal exception in any other form.    But the decisions have not stopped at this point; they have ruled that to come within the meaning of the Constitution, the cause of action

Marshall v. Baltimore and Ohio Railroad Company.

must have existed *ab origine* between citizens of different States, and that the article in question cannot be evaded by a transfer of rights which, by their primitive and intrinsic character, were not cognizable in the courts of the United States as between citizens of different States. See Turner v. The Bank of North America, already cited, and the cases of Montalet v. Murray, 4 Cranch, 46; and Gibson v. Chew, 16 Peters, 315. It is remarkable to perceive how perfectly the case of Turner v. The Bank of North America covers that now under consideration, and how strongly and emphatically it rebukes the effort to claim by indirect and violent construction, powers for the federal courts which not only have never been delegated to them, nor implied by the silence of the Constitution, but still more powers assumed in defiance of its express inhibition. In the case last mentioned, the plaintiffs were well described as citizens of Pennsylvania, suing Turner and others, who were properly described as citizens of North Carolina, upon a promissory note made by the defendants, and payable to Biddle and Company, and which, by assignment, became the property of the plaintiffs. Biddle & Co. were not otherwise described than as "using trade and partnership" at Philadelphia or North Carolina. Upon an exception upon argument, taken for the first time in this court, Ellsworth, Chief Justice, pronounced its decision in these words: "A Circuit Court is one of limited jurisdiction, and has cognizance not of causes generally, but only of a few specially circumstanced, amounting to a small proportion of the cases which an unlimited jurisdiction would embrace. And the fair presumption is, (not as with regard to a court of general jurisdiction, that a cause is within its jurisdiction unless the contrary appears, but rather) that a cause is without its jurisdiction till the contrary appears.

This renders it necessary, inasmuch as the proceedings of no court can be valid farther than its jurisdiction appears or can be presumed, to set forth upon the record of a circuit court, the facts or circumstances which give it jurisdiction, either expressly or in such manner as to render them certain by legal intendment. Amongst those circumstances it is necessary, where the defendant appears to be a citizen of one State, to show that the plaintiff is a citizen of some other State, or an alien; or if, as in the present case, the suit be upon a promissory note by an assignee, to show that the original promisee is so, for by a special provision of the statute it is his description as well as that of the assignee, which effectuates the jurisdiction; but here the description given of the promisee only is, that he used trade at Philadelphia or North Carolina; which, taking either place for that where he used trade, contains no averment that

29 *

he was a citizen of a State other than that of North Carolina. or an alien, nor any thing which by legal intendment can amount to such an averment." Let it be remembered, that the statute alluded to by Chief Justice Ellsworth is nothing more nor less than an assertion in terms of the second section of the third article of the Constitution; and it may then be asked, what becomes of this awkward attempt to force upon both the Constitution and statute a construction which the just meaning of both absolutely repels? Every one must be sensible that the seat of a man's business, of his daily pursuits and occupations, must probably, if not necessarily, be the place of his residence; yet here we find it expressly ruled, that such a commorancy by no just legal intendment any more than by express language, constitutes him a citizen of that community or State in which he may happen to be then residing or transacting his business; moreover, it is familiar to every lawyer or other person conversant with history, that during the periods of greatest jealousy and strictness of the English polity, aliens were permitted, for the convenience and advancement of commerce, to reside within the realm and to rent and occupy real property; but it never was pretended that such permission or residence clothed them with the character or with a single right pertaining to a British subject.

Nor has the doctrine ruled by the cases just cited been applied to proceedings at law alone, in which a peculiar strictness or an adherence to what may seem to partake of form is adhered to. The overruling authority of the Constitution has been regarded by this court as equally extending itself to equitable as to legal rights and proceedings in the courts of the United States. Thus in the case of Course *v.* Stead in 4 Dallas, 22. That was a suit in equity in the Circuit Court of the United States for the District of Georgia, in which it was deemed necessary to make a new party by a supplemental bill. This last bill recited the original bill, and all the orders which had been made in the cause, but omitted to allege the citizenship of the newly made defendant. In this case, when brought here by appeal from the court below, this court say, in reference to the omission to aver the citizenship of the new party, "it is unnecessary to form or to deliver any opinion upon the merits of this cause; let the decree of the Circuit Court be reversed." The case of Jackson *v.* Ashton, in 8 Peters, 148, is still more in point. This also was a suit in equity. The caption of the bill was in these words: " Thomas Jackson and others, citizens of the State of Virginia *v.* The Rev. William E. Ashton, a citizen of Pennsylvania." What said this court by its organ, Marshall, Chief Justice, upon this state of the case? " The title or cap-

tion of the bill is no part of the bill, and does not remove the objection of the defects in the pleadings. The bill and proceedings should state the citizenship of the parties to give the court jurisdiction." In these last decisions must be perceived the most emphatic refutation of this newly assumed version of the Constitution, which affirms that, although by the language of that instrument citizenship and neither residence nor property, but citizenship, the civil and political relation or *status* independently of either, is explicitly demanded, yet this requisition is fully satisfied by the presumption of a beneficiary interest in property apart either from possession or right of possession or from any legal estate or title makes the interest thus inferred equivalent with citizenship of the person to whom interest is thus strangely imputed. Perhaps the most singular circumstance attending the interpolation of this new doctrine is the effort made to sustain it upon the rule *stare decisis*. After the numerous and direct authorities before cited, showing the inapplicability to this case of this rule, it would have been thought *à priori* that the very last aid to be invoked in its support would be the maxim *stare decisis*. For this new class of citizen corporations, incongruous as it must appear to every legal definition or conception, is not less incongruous nor less novel to the relation claimed for it, or rather for its total want of relation to the settled adjudications of this court. It is strictly a new creation, an alien and an intruder, and is at war with almost all that has gone before it; and can trace its being no farther back than the case of Letson v. The Louisville Railroad Company.

The principle *stare decisis*, adopted by the courts in order to give stability to private rights, and to prevent the mischiefs incident to mutations for light and insufficient causes, is doubtless a wholesome rule of decision when derived from legitimate and competent authority, and when limited to the necessity which shall have demanded its application; but, like every other rule, must be fruitful of ill when it shall be wrested to the suppression of reason or duty, or to the arbitrary maintenance of injustice, of palpable error, or of absurdity. Such an application of this rule must be necessarily to rivet upon justice, upon social improvement and happiness, the fetters of ignorance, of wrong, and usurpation. It is a rule which, whenever applied, should be derived from a sound discretion, a discretion having its origin in the regular and legitimate powers of those who assert it. It can never be appealed to in derogation or for the destruction of the supreme authority, of that authority which created and which holds in subordination the agents whose functions it has defined, and bounded by clear and plainly-marked limits.

Wherever the Constitution commands, discretion terminates. Considerations of policy or convenience, if ever appealed to, I had almost said if ever imagined in derogation of its mandate, become an offence. Beyond the Constitution or the powers it invests, every act must be a violation of duty, an usurpation.

There cannot be a more striking example than is instanced by the case before us, of the mischiefs that must follow from disregarding the language, the plain words, or what may be termed the body, the *corpus*, of the Constitution, to ramble in pursuit of some *ignis fatuus* of construction or implication, called its spirit or its intention, — a spirit not unfrequently about as veracious, and as closely connected with the Constitution, as are the spirits of the dead with the revolving tables and chairs which, by a fashionable metempsychosis of the day, they are said to animate.

The second section of the third article of the Constitution prescribes citizenship as an indispensable requisite for obtaining admission to the courts of the United States — prescribes it in language too plain for misapprehension. This court, in the case of Deveaux and the Bank of the United States, yielded obedience, professedly at any rate, to the constitutional mandate : for they asserted the indispensable requisite of citizenship ; but in an unhappy attempt to reconcile that obedience with an unwarranted claim to power, they utterly demolished the legal rights, nay, the very existence of one of the parties to the controversy, thereby taking from that party all standing or capacity to appear in any court. This was *ignis fatuus*, No. 1. This was succeeded by the case of Letson *v.* The Cincinnati and Louisville Railroad Company, in which, by a species of judicial resurrection, this party (the corporation) was *deterré*, raised up again, but was not restored to the full possession of life and vigor, or to the use of all his members and faculties, nor even allowed the privilege of his original name ; but semianimate, and in virtue of some rite of judicial baptism, though " curtailed of his natural dimensions," he is rendered equal to a release from the thraldom of constitutional restriction, and made competent at any rate to the power of commanding the action of the federal courts. This is *ignis fatuus*, No. 2. Next in order is the case of Marshall *v.* The Baltimore and Ohio Railroad Company. This is indeed the *chef d'œuvre* amongst the experiments to command the action of the spirit in defiance of the body of the Constitution.

It is compelled, from the negation of that instrument, by some necromantic influence, potent as that by which, as we read, the resisting Pythia was constrained to yield her vaticinations of an occult futurity. For in this case is manifested the most en-

tire disregard of any and every qualification, political, civil, or local. This company is not described as a citizen or resident of any State; nor as having for its members the citizens of any State; nor as a *quasi* citizen; nor as having any of the rights of a citizen; nor as residing or being located in any State, or in any other place. No intimation of its "whereabout" is alluded to. It is said to have been incorporated by the State of Maryland; but whether the State of Maryland had authority to fix its locality or ever directed that locality, and whether that be in the moon or *in terra incognita*, is no where disclosed. It is said that because this company was incorporated by the Legislature of Maryland, we may conjecture, and are bound to conjecture, that it is situated in Maryland, and must possess all the qualifications appertaining to a citizen of Maryland to sue or be sued in the courts of the United States; and this inference we are called upon to deduce, in opposition to the pleadings, the proofs, and the arguments, all of which demonstrate, that this corporation claims to extend its property, its powers, and operations, and of course its locality, over a portion of the State of Virginia, and that it was in reference to its rights and operations within the latter State, that the present controversy had its origin.

Thus does it appear to me that this court has been led on from dark to darker, until at present it is environed and is beaconed onward by varying and deceptive gleams, calculated to end in a deeper and more dense obscurity. In dread of the precipices to which they would conduct me, I am unwilling to trust myself to these rambling lights; and if I cannot have reflected upon my steps the bright and cheering day-spring of the Constitution, I feel bound nevertheless to remit no effort to halt in what, to my apprehension, is the path that terminates in ruin. And in considering the tendencies and the results of this progress, there is nothing which seems to me more calculated to hasten them than is the too evidently prevailing disposition to trench upon the barrier which, in the creation by the several States of the federal government, they designed to draw around and protect their sovereign authority and their social and private rights; and to regard and treat with affected derision every effort to arrest any hostile approach, either indirectly or openly, to the consecrated precincts of that barrier. It is indeed a sad symptom of the downward progress of political morals, when any appeal to the Constitution shall fail to "give us pause," and to suggest the necessity for solemn reflection. Still more fearful is the prevalence of the disposition, either in or out of office, to meet the honest or scrupulous devotion to its commands with a sneer, as folly unsuited to the times, and condemned by that

new-born wisdom which measures the Constitution only by its own superior and infallible standard of policy and convenience. By the disciples of this new morality it seems to be thought that the mandates or axioms of the Constitution, when found obstructing the way to power, and when they cannot be overstepped by truth or logic, may be conveniently turned and shunned under the denomination of abstractions or refinements; and the loyal supporters of those mandates may be borne down under the reproach of a narrow prejudice or fanaticism incapable of perceiving through the letter, and, in contradiction of the language of the charter, its true spirit and intent; and as being wholly behind the sagacity and requirements of the age.

We cannot, however, resist the disposition to ask of those whose expanded and more pervading view can penetrate beyond the palpable form of the charter, what it is they mean to convey by the term *abstraction*, which is found so well adapted to their purposes? We would, with becoming modesty, inquire whether every axiom or precept, either in politics or ethics, or in any other science, is not an abstraction? Whether truth itself, whether justice or common honesty is not an abstraction? And we would farther ask those who so deal with what they call abstractions, whether they design to assail all general precepts and definitions as incapable of becoming the fixed and fundamental basis of rights or of duties. The philosophy of these expositions may easily embrace the rejection of the decalogue itself, and might be particularly effectual in reference to that injunction which forbids the coveting of all that appertains to our neighbor. The Constitution itself is nothing more than an enumeration of general abstract rules, promulged by the several States, for the guidance and control of their creature or agent, the federal government, which for their exclusive benefit they were about to call into being. Apart from these abstract rules the federal government can have no functions and no existence. All its attributes are strictly derivative, and any and every attempt to transcend the foundations (those proscribed abstractions) on which its existence depends, is an attempt at anarchy, violence, and usurpation. Amongst the most dangerous means, perhaps, of accomplishing this usurpation, because its application is noiseless whilst it is persevering, is the habitual interference, for reasons entirely insufficient, by the federal authorities with the governments of the several States; and this too most commonly under the strange (I had almost called it the preposterous) pretext of guarding the people of the States against their own governments, constituted of, and administered by, their own fellow-citizens, bound to them by the sympathies arising from a community or identity of interests,

from intimate intercourse, and selected by and responsible to themselves. Or it may be said, under the excuse of protecting the people of the States against themselves, converting the federal government in reference to the States into one grand commission, " *De lunatico inquirendo.*" The effect of this practice is to reduce the people of the States and their governments under an habitual subserviency to federal power; and gives to the latter what ever has been and ever must be, the result of intervention by a foreign, a powerful, and interested mediator, the lion's share in every division. For myself I would never hunt with the lion. I would anxiously avoid his path; and as far as possible keep him from my own; always bearing in mind the pregnant reply told in the Apologue as having been made to his gracious invitation to visit him in his lair; that although in the path that conducted to its entrance, innumerable footprints were to be seen, yet in the same path there could be discerned " *Nulla vestigia retrorsum.*" The vortex of federal incroachment is of a capacity ample enough for the engulfing and retention of every power; and inevitably must a catastrophe like this ensue, so long as a justification of power, however obtained, and the end of every hope of escape or redemption can, to the sickening and desponding sense, in the iron rule of *stare decisis*, be proclaimed. A rule which says to us, " The abuse has been already put in practice; it has, by practice merely, become sanctified; and may therefore be repeated at pleasure." The promulgation of a doctrine like this does indeed cut off all hope of redress, of escape, or of redemption, unless one may be looked for, however remote, in a single remedy — that sharp remedy to be applied by the true original sovereignty abiding with the States of this Union, namely, a reorganization of existing institutions, such as shall give assurance that if in their definition and announcement their rights can, by their appointed agents, be esteemed as abstractions merely, yet in the concrete, that is, in the exercise and enjoyment, these rights are real and substantive, and may neither be impaired nor denied.

My opinion is, that this cause should have been dismissed by the Circuit Court for want of jurisdiction, and should now be remanded to that court with instruction for its dismission.

Mr. Justice CAMPBELL.

I dissent from that portion of the opinion of the court which affirms the jurisdiction of the Circuit Court in this case. The question involves a construction of a clause in the Constitution, and arises under circumstances which make it proper that I should record the reasons for the dissent.

The conditions under which corporations might be parties to suits in the courts of the United States engaged the attention of this court not long after its organization. At the session of the court, in 1809, three cases exhibited questions of jurisdiction in regard to them, under three distinct aspects. The Bank of the United States v. Deveaux, was the case of a corporation plaintiff, whose corporators were described as citizens of Pennsylvania suing a citizen of Georgia in the Federal Court of that State. The case of Wood v. Maryland Insurance Company, was that of a corporation defendant, whose corporators were properly described, sued in the State of its charter. And the case of Hope Insurance Company v. Boardman, was that of a "legally incorporated body," sued in the State from which it derived its charter, and was "legally established," but of whose corporators there was no description, 5 Cranch, 57, 61, 78.

The cases were argued together by counsel of eminent ability, with preparation and care, and were decided by the court with much deliberation and solemnity. Chief Justice Marshall declared the opinion of the court to be " that the invisible, intangible, and artificial being, the mere legal entity, a corporation aggregate, is certainly not a citizen, and consequently cannot sue or be sued in the courts of the United States unless the rights of the members in this respect can be exercised in the corporate name." As it appeared in the two cases first mentioned that the corporators might sue and be sued in the courts of the United States under the circumstances of the cases, the court on those cases treated them " as a company of individuals who, in transacting their joint concerns, had used a legal name," and for the reason " that the right of a corporation to litigate depended upon the character (as to citizenship) of the members which compose it, and that a body corporate cannot be a citizen within the meaning of the Constitution. The judgment in the last case was reversed for want of jurisdiction."

In Sullivan v. Fulton Steamboat Company, 6 Wheat. 450, the defendant was described as a body corporate, incorporated by the Legislature of the State of New York, for the purpose of navigating, by steamboats, the waters of East River or Long Island Sound, in that State." This corporation was sued in New York. Upon appeal, this court determined that the Circuit Court had no jurisdiction of the defendant. In Breithaupt v. The Bank of Georgia, that corporation was sued in that State, but this court certified " that as the bill did not aver that the corporators of the Bank of Georgia are citizens of the State of Georgia, the Circuit Court had no jurisdiction of the case." In the Vicksburg Bank v. Slocomb, 14 Pet. 60, a corporation was sued by a citizen of a different State, in the State of its char-

ter, but it appearing by plea, that two of its corporators were citizens of the same State as the plaintiff, this court declined jurisdiction for the federal tribunals. This was in accordance with the circuit decisions, 4 Wash. C. C. 597; 3 Sumn. 472; 1 Paine; and their doctrine was repeated in Irvine v. Lowrey, 14 Pet. 293. Such was the condition of the precedents in this court when, in 1844, the case of Louisville Railroad Company v. Letson, 2 How. 497, arose. . The case was one of a New York plaintiff suing a South Carolina corporation, in that State, and describing its corporators as citizens. It appeared by plea, among other things, not material to the present discussion, " that two of the corporators were citizens of North Carolina."

In similar pleas, before this, it had appeared that the corporators belonged to the State of the adverse party, and consequently were within the exclusion of the eleventh section of the Judiciary Act of 1789. In the present case the plaintiff was a citizen from a different State from these corporators. The court notices this fact as a peculiarity. " The point," they say, " has never before been under the consideration of this court. We are not aware that it ever occurred in either of the circuits until it was made in this case. It has not then been directly ruled in any case." The court proceeded then to decide that there was jurisdiction under the Constitution, for the parties were citizens of different States, and that the Judiciary Act did not exclude it. Thus was this point in the plea disposed of, upon grounds which unsettled none of the cases before cited. The court avows this, and says, " that the case might be safely put upon these reasonings," conducted " in deference to the doctrines of former cases." It then proceeds, " but there is a broader ground, upon which we desire to be understood upon which we altogether rest our present judgment, although it might be maintained upon the narrower ground already suggested. It is, that a corporation created by and doing business in a particular State, is to be deemed, to all intents and purposes, as a person, although an artificial person, an inhabitant of the same State, for the purposes of its incorporation, capable of being treated as a citizen of that State, as much as a natural person."

Since the decision of Letson's case, there have been cases of corporations, suing in the federal courts beyond the State of their location, and suing and being sued in the State of their location, in which this question might have been considered in this court. But there was no argument at the bar, and no notice of it in the opinion of the court. In one of these, one of the six judges who assisted in the decision of Letson's case expressed strongly a disapprobation of its doctrine, while another limited

the conclusions of the court to the decision of the case then before it. Rundle v. Delaware Canal Company, 14 How. 80.

The case of the Indiana Railroad Company v. Michigan Railroad Company, 15 How. 233 presented the question now before us, and at that time I was favorable to its reexamination; but this was expressly waived by the court, and the case decided upon another question of jurisdiction.

In the case of the Methodist Church, there was but one corporation before the court as a party. The two corporators who composed that were defendants in their corporate, as well as individual capacity. The citizenship of all the parties to the record was legally declared; and the parties to the record legally represented, all the interests of the voluntary association at issue. In reference to jurisdiction, Justice Washington says, " the cases of a voluntary association, trustees, executors, partners, legatees, distributees, parishioners, and the like, are totally dissimilar to a corporation, and this dissimilarity arises from the peculiar character of a corporation, (4 Wash. C. C. R. 595,) and this is clear by the decisions of this court. 4 Cranch, 306; 8 Wheat. 642.

I have been thus specific in the statement of the precedents in the court, that it may appear that this dissent involves no attempt to innovate upon the doctrines of the court, but the contrary, to maintain those sustained by time and authority in all their integrity.

The declaration before us describes the defendant " as a body corporate by act of the General Assembly of Maryland," and corresponds therefore with the cases cited from 5 Cranch, 57; 6 Wheat. 450; 1 Pet. 238; and in those cases jurisdiction was first questioned and disclaimed in this court. These cases were not cited in Letson's case, and are decisive of this.

If we search the record for facts to sustain the jurisdiction, we can collect that the defendant has been recognized as a body corporate by the Legislature of Virginia, is commorant, and transacts business there by its authority, has for its corporators citizens and a city of that State, and that the plaintiff is also a citizen of Virginia. If these facts are considered with reference to the question of jurisdiction, all the cases decided by this court on this subject have principles which would exclude it. Even Letson's case prescribes, that the corporation should carry on its business in the State of its charter, and that case hardly contemplated an estoppel, such as is described in the opinion of the court.

I am compelled to consider this case as uncontrolled by the declaration of doctrine in Letson's case; nor do I consider the cases in which the decision of the question has been waived as obligatory. I cannot look for the conclusions of this court or

any of its members, except from the public, authorized and responsible opinions delivered here in cases legitimately calling for them. For this conclusion I have the sanction of the highest authority. Chief Justice Marshall, replying to the argument that corporations under no circumstances, and by no averment, could be a party to a suit in the courts of the United States, says "repeatedly has this court decided cases betwen a corpo-tion and an individual without feeling a doubt of its jurisdiction," and adds, "those decisions are not cited as authority, for they were made without a consideration of the particular point."

The inquiry now presented is, shall I concur in a judgment which removes the ancient landmarks of the court, in reference to its jurisdiction, and which it established with care and solemnity, and maintained for so long a period with consistency and circumspection? I am compelled to reply in the negative.

A corporation is not a citizen. It may be an artificial person, a moral person, a juridical person, a legal entity, a faculty, an intangible, invisible being; but Chief Justice Marshall employed no metaphysical refinement, nor subtlety, nor sophism, but spoke the common sense, "the universal understanding," as he calls it, of the people, when he declared the unanimous judgment of this court, "that it certainly is not a citizen."

Nor were corporations within the contemplation of the framers of the Constitution when they delegated a jurisdiction over controversies between the citizens of different States. The citation by the court from the Federalist, proves this. It is said by the writers of that work, "that it may be esteemed as the basis of union that the citizens of each State shall be entitled to all the immunities and privileges of citizens of the several States." And if it be a just principle that every government ought to possess the means of executing its own provisions, by its own authority, it will follow that, in order to the inviolable maintenance of that equality of immunities and privileges to which citizens of the Union will be entitled, the national judiciary ought to preside in all cases in which one State or its citizens are opposed to another State or its citizens." Thus to administer the rights and privileges of citizens of the different States, held under a constitutional guaranty, when brought into collision or controversy — rights and immunities derived from the constitutional compact, and forming one of its fundamental conditions, was the object of this jurisdiction. The commonplace, that it resulted as a concession to the possible fears and apprehensions of suitors, that justice might not be impartially administered in State jurisdiction, soothing as it is to the official sensibilities of the federal courts, furnishes no satisfactory explanation of it.

Hence the interpretation of that instrument which transferred to the artificial persons created by State legislation, the rights or privileges of the corporators, derived from the Constitution of the United States, as citizens of the Union, and held independently and without any relation to their rights as corporators — was, to say no more, a broad and liberal interpretation. Nor did the court in Deveaux's case affect the least self-denial or diffidence in making the bounds of its power. It declared that "the duties of the court, to exercise a jurisdiction where it·is conferred, and not to usurp it where it is not conferred, are of equal obligation," and in this spirit rejected a jurisdiction over a·case exactly like the present.

The doctrine of the court in Earle's case, 13 Peters, 519, and Runyan's case, 14 Peters, 122, to the result that corporations have no extraterritorial rights, but that the legal exercise of their faculties, extraterritorially, was the effect of a rule of comity among the States, dependent upon their policy and convenience, and revocable at their pleasure, was in harmony with these judgments of the court, and the constitutional principles I have stated. The administration of the rules of domestic policy adopted by the several States, in reference to these artificial creatures of a domestic legislation, belonged to State jurisdictions, and were ascertainable from its laws and judicial interpretations. But when, from the later case of Letson, it was supposed that these legal entities had a status which admitted them to the federal tribunals by a constitutional recognition, the inquiry at once arose, for what purpose was this privilege held? The interdependence between the sections of the Constitution which defined the privileges and immunities of citizens of the Union, and the jurisdiction of the federal courts in controversies between citizens of the States, was known and felt. It was argued that the capacity to sue was only a consequent of the right to contract, to hold property, and to perform civil acts. They commenced, therefore, an agitation of the State courts for their rights as "citizens of the Union." The Supreme Court of Kentucky, (12 B. Mon. 212,) repelling these pretensions and exposing their perilous character, thus refers to Letson's case, which had been relied on for their support: "There are some expressions in that opinion which indicate that corporations may be regarded as citizens to all intents and purposes. But in saying this, the court went far beyond the question before them, and to which it may be assumed that their attention was particularly directed." So, too, in New Jersey, 3 Zabris. 429, it was argued that the existence of the extraterritorial rights of corporations "is not now a question of comity in the United States, but a constitutional principle incapable of being altered by State legislation."

And opinions from jurists of preëminence in Massachusetts and New York were laid before the court to sustain the argument founded upon the relaxing doctrines of this court.

Thus the introduction of new subjects of doubt, contest, and contradiction, is the fruit of abandoning the constitutional landmarks.

Nor can we tell when the mischief will end. It may be safely assumed that no offering could be made to the wealthy, powerful, and ambitious corporations of the populous and commercial States of the Union so valuable, and none which would so serve to enlarge the influence of those States, as the adoption, to its full import, of the conclusion, "that to all intents and purposes, for the objects of their incorporation, these artificial persons are capable of being treated as a citizen as much as a natural person."

The Supreme Court of Kentucky says, truly, "The apparent reciprocity of the power would prove to be a delusion. The competition for extraterritorial advantages would but aggrandize the stronger to the disparagement of the weaker States. Resistance and retaliation would lead to conflict and confusion, and the weaker States must either submit to have their policy controlled, their business monopolized, their domestic institutions reduced to insignificance, or the peace and harmony of the States broken up and destroyed." To this consummation this judgment of the court is deemed to be a progress. The word "citizen," in American constitutions, state and federal, had a clear, distinct, and recognized meaning, understood by the common sense, and interpreted accordingly by this court through a series of adjudications.

The court has contradicted that interpretation, and applied to it rules of construction which will undermine every limitation in the Constitution, if universally adopted. A single instance of the kind awakens apprehension, for it is regarded as a link in a chain of repetitions.

The litigation before this court, during this term, suffices to disclose the complication, difficulty, and danger of the controversies that must arise before these anomalous institutions shall have attained their legitimate place in the body politic. Their revenues and establishments mock at the frugal and stinted conditions of State administration; their pretensions and demands are sovereign, admitting impatiently interference by State legislative authority. And from the present case we learn that disdainful of "the careless arbiters" of State interests, they are ready "to hover about them" in "efficient and vigilant activity," to make of them a prey; and, to accomplish this, to employ corrupting and polluting appliances.

I am not willing to strengthen or to enlarge the connections between the courts of the United States and these litigants. I can consent to overturn none of the precedents or principles of this court to bring them within their control or influence. I consider that the maintenance of the Constitution, unimpaired and unaltered, a greater good than could possibly be effected by the extension of the jurisdiction of this court, to embrace any class either of cases or of persons.

Mr. Justice Catron authorizes me to say that he concurs in the conclusions of this opinion.

Our opinion is, that the judgment of the Circuit Court should be affirmed for the want of jurisdiction.

## *Order.*

This cause came on to be heard on the transcript of the record from the Circuit Court of the United States for the District of Maryland, and was argued by counsel. On consideration whereof it is now here ordered and adjudged by this court, that the judgment of the said Circuit Court in this cause be, and the same is hereby affirmed, with costs.