Richard J. STERNBERG, M.D., Plaintiff Below–Appellant,

v.

NANTICOKE MEMORIAL HOSP., INC.; Daniel J. Werner; John Appiott, D.O.; Angel Alicea, M.D.; Harry Anthony, M.D.; Christopher Roberts, M.D.; Joseph Karnish, D.O.; Victor Dejesus, M.D.; Louis F. Owens, Jr., M.D.; Richard Simons, D.O.; James Rupp, M.D.; Judith Tobin, M.D.; Thomas Benz, M.D.; Marie Wolfgang, M.D.; and Stephen Carey, M.D., Defendant Below–Appellee.

No. 219, 2012.

Supreme Court of Delaware.

Submitted: Dec. 3, 2012.
Decided: Feb. 28, 2013.

Daniel F. Wolcott, Jr., Esquire, of Potter Anderson & Carroon LLP, Wilmington, Delaware; Of Counsel: Kevin E. Raphael, Esquire (argued) and Christopher A. Iacono, Esquire of Pietragallo Gordon Alfano Bosick & Raspanti, LLP, Philadelphia, Pennsylvania for Appellant.

David R. Hackett, Esquire, of Griffin & Hackett, P.A., Georgetown, Delaware for Appellee.

Before STEELE, Chief Justice, HOLLAND, BERGER, JACOBS, and RIDGELY, Justices, constituting the Court en Banc.

RIDGELY, Justice:

Plaintiff-below/Appellant Richard J. Sternberg, M.D. ("Sternberg") brought an action against Defendants-below/Appellees Nanticoke Memorial Hospital, its CEO and members of the hospital's Medical Executive Committee ("MEC") (collectively "Nanticoke") for tortious interference with existing business relationships, defamation, and breach of the Medical Staff Bylaws. His legal action arose from a precautionary suspension of his clinical privileges imposed by Nanticoke under its professional review procedures.

Nanticoke asserted immunity under federal and state law and sought attorneys fees, citing 42 U.S.C. § 11113 of the Health Care Quality Improvement Act ("HCQIA") and also a fee-shifting provision of Nanticoke's Medical Staff Bylaws Credentials Policy ("Credentials Policy").

After cross-motions for summary judgment, the Superior Court denied Sternberg's motion and granted Nanticoke's motion, awarding attorney's fees under the HCQIA without addressing Nanticoke's claim for costs and fees under the Credentials Policy.[1] Sternberg appealed and we affirmed on the issue of immunity but reversed the award of attorney's fees under the HCQIA because Sternberg refuted the only fact supporting the requisite bad faith for an award under the Act.[2] We remanded and the Superior Court awarded attorney's fees in the amount of $412,942.85 and $25,805.36 in costs based upon the Credentials Policy.[3] This appeal followed.

Sternberg raises three claims on appeal. First, he claims that the Superior Court erred by granting Nanticoke's motion for summary judgment for attorney's fees under the Credentials Policy, because the bylaw violates public policy. Second, he claims the Credentials Policy is unenforceable against him because Nanticoke materially breached the bylaws. Finally, he claims that the Superior Court abused its discretion in determining the amount of attorney's fees and costs to be awarded. We find no merit to the appeal and affirm.

*Factual Background*

For factual background we rely upon our earlier opinion[4] but will restate some of those facts to provide context for this appeal.

Dr. Richard J. Sternberg, an orthopedic surgeon, was on the medical staff at the Nanticoke Memorial Hospital from December 1999 through February 2008. He was critical of hospital practices and frequently spoke out about quality of care issues that were not being addressed. The manner in which he expressed his views, however, and his general interaction with the staff, was problematic. Based on the list of "Incidents of Disruptive or Unacceptable Behavior" compiled for this litigation, Sternberg's outbursts began shortly after he arrived at Nanticoke and continued until he was suspended. Nurses, patients, and/or doctors filed complaints every few months. Virtually all of the complaints

---

1. *Sternberg v. Nanticoke Mem. Hosp., Inc.,* 2009 WL 3531791 (Del.Super., Sept. 18, 2009).

2. *Sternberg v. Nanticoke Mem. Hosp. Inc.,* 15 A.3d 1225 (Del.2011).

3. *Sternberg v. Nanticoke Mem. Hosp. Inc.,* C.A. No. 07C–10–011, 2012 WL 5830150 (Del.Super., Feb. 13, 2012) (slip op.); *Sternberg v. Nanticoke Mem. Hosp. Inc.,* C.A. No. 07C–10–011, 2012 WL 5830208 (Del.Super. March 30, 2012) (letter op.).

4. *See Sternberg,* 15 A.3d at 1227–1230.

concerned both his loud and antagonistic manner and his demeaning comments. Nanticoke responded to these complaints by talking to Sternberg about the need to improve his communication skills, requiring him to send letters of apology, and threatening him with further action if his conduct did not improve.

Sternberg's conduct on July 12 and July 13, 2006 was deemed so inappropriate that it precipitated two MEC meetings and a recommendation that Sternberg's medical privileges be revoked. The incident on July 12th arose because Sternberg was dissatisfied with the way his cases were being scheduled. After belittling the staff, he barged into, and disrupted, a doctors' meeting by "waving his arms wildly while verbally attacking [a Hospital staff member]...." On July 13th, Sternberg was in the operating room, about to perform a procedure, when he learned that necessary instruments were not there. He became very angry and waved the drill he was holding in the air. Another Doctor was called to the operating room and tried to calm Sternberg down. Eventually, the proper instruments were brought in and Sternberg completed the surgery.

By letter dated July 26, 2006, Nanticoke CEO Daniel J. Werner advised Sternberg that the Executive Committee was prepared to recommend to the Nanticoke Board that his staff appointment and clinical privileges be revoked. The recommendation was based on his "continuing pattern of disruptive behavior," that "placed patients at risk." The letter repeated an earlier warning that, "any further incident of inappropriate behavior on your part, including, but not limited to, displays of anger, loud tone of voice, or disruption of any kind" will result in immediate suspension. Finally, Werner wrote that Sternberg could take a voluntary leave of absence for the remainder of his term of appointment. Sternberg requested a hearing, as well as a 60 day postponement to allow him to retain an attorney. Werner granted the request, but again warned Sternberg that he would be suspended immediately if he engaged in "any inappropriate behavior...."

Despite the repeated warnings, on October 13, 2006 Sternberg again put his "toes over the line." By that time, he was running for public office. Sternberg had been told that he could not campaign or wear political buttons in the hospital. Nevertheless, he invited a newspaper reporter, who was covering his campaign, to observe one of his operations. Sternberg obtained written consent from the patient and all necessary hospital staff, but he represented that the visitor's purpose was "educational." The staff provided the reporter with appropriate clothing and instructed her on the use of her mask. As the patient was being prepped for the procedure, someone asked if the visitor was a student. The visitor replied that she was a reporter for a local newspaper. At that point, one of the nurses left the operating room and told a supervisor that the visitor was a reporter. An administrator promptly escorted the reporter out of the operating room and out of the hospital. The surgery proceeded successfully.

Before the day was over, Sternberg was placed on a "precautionary suspension." Werner's letter stated that, by bringing a reporter into the operating room under false pretenses, Sternberg "disrupt[ed] the ability of the Operating Room staff to provide appropriate patient care and subject[ed] the patient to risk." The letter advised that the reporter's presence in, and later removal from, the operating room created "infection risks."

Without any further investigation of the facts, the MEC voted to continue the precautionary suspension. Again, the doctors

on the MEC were not focusing on possible harm to patients or other individuals. The only relevant fact was that Sternberg broke the rules by misrepresenting the visitor's purpose.

Nanticoke continued to offer Sternberg the option of a leave of absence in lieu of a suspension, and Sternberg ultimately accepted that resolution. On December 7, 2006, the Nanticoke Board voted to reappoint Sternberg, subject to his successful completion of a three day program for physicians who engage in disruptive behavior. Sternberg complied with that condition and returned to work on December 14, 2006. He remained at Nanticoke until he resigned on January 31, 2008.

Shortly before he resigned, Sternberg commenced this action.

### Discussion

■ We review the Superior Court's grant of summary judgment *de novo* "to determine whether, viewing the facts in the light most favorable to the nonmoving party, the moving party has demonstrated that there are no material issues of fact in dispute and that the moving party is entitled to judgment as a matter of law."[5]

### The Credentials Policy is not against public policy

■ Sternberg challenges the enforceability of the fee shifting provision of the Credentials Policy. He contends the fee shifting provision violates public policy because it provides for a lower standard for the awarding of fees—not prevailing in the legal action—than was intended by Congress when it authorized the award of attorney's fees. The HCQIA provides in

§ 11113 for attorney's fees "if the claim, or the claimant's conduct during the litigation of the claim, was frivolous, unreasonable, without foundation, or in bad faith."[6]

Section 2.C.2 of the Credentials Policy states, in relevant part:

> By requesting an application and/or applying for appointment ... or clinical privileges, the individual expressly accepts the following conditions ...

> (a) *Immunity:* To the fullest extent permitted by law, the individual released from any and all liability, extends absolute immunity to, and agrees not to sue the Hospital, any member of the Medical Staff ... for any matter relating to appointment, reappointment, clinical privileges....

> ...

> (d) *Hearing and Appeal Procedures:* The individual agrees that the hearing and appeal procedures set forth in this Policy will be the sole and exclusive remedy with respect to any professional review action taken by hospital.

> (e) *Legal Actions:* If, notwithstanding the provisions of this Section, an individual institutes legal action and does not prevail, he or she will reimburse the Hospital and any member of the Medical Staff named in the action for all costs incurred in defending such legal action, including reasonable attorney's fees.

When Sternberg reapplied for clinical privileges after his suspension, he agreed to abide by the Medical Staff By–Laws.[7] Now, Sternberg argues that the HCQIA precludes the award of attorney's fees in any situation other than one which meets

---

**5.** *State Farm Mut. Auto. Ins. Co. v. Patterson,* 7 A.3d 454, 456 (Del.2010) (*quoting Brown v. United Water Delaware, Inc.,* 3 A.3d 272, 275 (Del.2010)).

**6.** 42 *U.S.C.* § 11113.

**7.** Appendix to Appellee's Answering Brief at B–52–53.

the HCQIA standard. We find no merit to this argument.

The United States Congress stated its findings in the preamble to the "Encouraging Good Faith Professional Review Activities" section of the HCQIA as follows:

The Congress finds the following:

(1) The increasing occurrence of medical malpractice and the need to improve the quality of medical care have become nationwide problems that warrant greater efforts than those that can be undertaken by any individual State.

(2) There is a national need to restrict the ability of incompetent physicians to move from State to State without disclosure or discovery of the physician's previous damaging or incompetent performance.

(3) This nationwide problem can be remedied through effective professional peer review.

(4) The threat of private money damage liability under Federal laws, including treble damage liability under Federal antitrust law, unreasonably discourages physicians from participating in effective professional peer review.

(5) There is an overriding national need to provide incentive and protection for physicians engaging in effective professional peer review.[8]

▮ Sternberg argues that this prefatory language, in conjunction with the language of § 11113 previously quoted, indicates Congress has found as a matter of public policy that the award of attorneys fees should be limited to suits that are frivolous, unreasonable, without foundation, or brought in bad faith. "It is an undoubted principle of the common law that it will not lend its aid to enforce a contract to do an act that is illegal, or which is inconsistent with sound morals or public policy, or which tends to corrupt or contaminate, by improper influences, the integrity of our social or political institutions."[9] Questions of public policy are best left to the legislature,[10] and when it declares a public policy consistent with the constitution, we will apply it. But "[p]ublic policy considerations only empower courts to construct gap fillers when the statute is ambiguous, and unambiguous statutory text trumps the statute's purpose or broad public policy preamble."[11]

We are not persuaded that any national or state public policy precludes the fee shifting bylaw at issue here. The plain language of § 11113 does not address contractual fee shifting. Nor does the Delaware Peer Review Act.[12] Sternberg has not shown that either was enacted to limit the ability of private parties to enter into a contract providing for the shifting of attorney's fees in this context. Other state and federal courts, including the U.S. Supreme Court, have recognized that other provisions of the HCQIA do not preempt more stringent state laws or contracts interpret-

---

8. 42 *U.S.C.* § 11101.

9. *Marshall v. Baltimore and Ohio R.R. Co.*, 57 U.S. 314, 334, 16 How. 314, 14 L.Ed. 953 (1853).

10. *Shea v. Matassa*, 918 A.2d 1090, 1092 (Del. 2007) ("[T]he parties raise controversial and competing public policy questions which the General Assembly can more effectively debate, consider and resolve through the legislative process."); *Moss Rehab. v. White*, 692 A.2d 902, 909 (1997) ("The General Assembly is best able to address the competing public policy issues....").

11. *Progressive Northern Ins. Co. v. Mohr*, 47 A.3d 492, 510 (Del.2012) (Steele, C.J.dissenting).

12. 24 *Del. C.* § 1768.

ed under state law.[13] If Congress or the General Assembly wish to create such a limitation, it is within their power to do so. Until that day, private parties are free to contract for broader standards to protect the peer review process, as was done here.

██ It has long been the practice of American courts to enforce the so-called "American Rule"—which requires each party to pay his or her own legal costs, even the prevailing party.[14] Sternberg argues the American Rule establishes a public policy against the sort of provisions included in the Credentials Policy. However, the American Rule is not absolute. "An exception to [the American R]ule is found in contract litigation that involves a fee shifting provision. In these cases a trial judge may award the prevailing party all the costs it incurred during litigation."[15]

Sternberg also argues that the Credentials Policy is against public policy because it releases Nanticoke from liability·from all future claims, including negligence and intentional torts. Sternberg is mistaken in his characterization of the Credential Policy. The Policy, by its plain language, only exculpates the CEO and MEC "[t]o the fullest extent permitted by law." Therefore, if it is improper to release a party from an intentional tort, this would not be covered by the Credential Policy because it would be beyond the extent permitted by law. Furthermore, the immunity clause only covers matters "relating to appointment, reappointment, clinical privileges, or the individuals qualifications for the same." As the Superior Court explained, "[S]uch a provision seems an appropriate reinforcement of the public policy behind the adoption of the HCQIA...."

Given the acceptance of contractual fee shifting provisions and the absence of an express statutory prohibition of a fee shifting agreement in this context, we find no merit to Sternberg's public policy arguments.[16]

13. *See Patrick v. Burget*, 486 U.S. 94, 105 n. 8, 108 S.Ct. 1658, 100 L.Ed.2d 83 (1988) (finding the HCQIA was not intended to preempt any immunity provided to peer review activities by state statutes, finding states could offer broader protections and immunize peer review conduct that would not otherwise satisfy the standards of federal law, "The Act expressly provides that it does not change other 'immunities under law,' § 11115(a), including the state-action immunity, thus allowing States to immunize peer-review action that does not meet the federal standard."). *Hoffman v. Spring Valley Hospital and Medical Center*, 2010 WL 3341802 (Nev.2010) (slip op.) (finding the HCQIA did not preempt a physician's cause of action for rescission of his contract with a hospital); *Columbia Hosp. Corp. of South Broward v. Fain*, 16 So.3d 236 (Fla.Dist.Ct.App.2009) (finding the HCQIA did not preempt Florida's constitutional amendment addressing patients rights to discovery records relating to adverse medical incidents); *Cf. Wood v. Archbold Medical Center, Inc.*, 738 F.Supp.2d 1298 (M.D.Ga.2010) (finding a Georgia statute providing absolute immunity for a peer review board to be preempted by the HCQIA's immunity provisions, *Id.* at 1373, but finding that an express waiver in a private contract could waive HCQIA immunity for a hospital, *Id.* at 1348, and specifically not reaching the interaction between a private contract-independent from the Georgia statute-and the HCQIA, *id.* at 1373).

14. *See Tandycrafts, Inc. v. Initio Partners*, 562 A.2d 1162, 1164 (Del.1989) ("The starting principal is recognition of the so-called American Rule, under which a prevailing party is responsible for the payment of his own counsel fees in the absence of statutory authority or contractual undertaking to the contrary."); *Arcambel v. Wiseman*, 3 U.S. 306, 3 Dall. 306, 1 L.Ed. 613 (1796).

15. *Mahani v. EDIX Media Group, Inc.*, 935 A.2d 242, 245 (Del.2007).

16. In supplemental briefing Sternberg argues, for the first time, that the fee-shifting provision is against public policy because physicians have no bargaining power over the cre-

*Nanticoke did not breach the Credentials Policy so as to excuse Sternberg from performing under the fee-shifting agreement*

■ Sternberg next claims that Werner and the MEC breached the Credentials Policy because Werner and the MEC allegedly failed to follow the proper procedure for instituting a precautionary suspension.

The Credentials Policy describes the following process for review of a suspension:

6.C.2. Executive Committee Procedure:

(a) The Executive Committee will review the matter resulting in a precautionary suspension ... within a reasonable time under the circumstances, not to exceed 14 days.

(b) After considering the matters resulting in the suspension or restriction and the individual's response, if any, the [MEC] will determine whether there is sufficient information to warrant a final recommendation, or whether it is necessary to commence an investigation. The Executive Committee will also determine whether the precautionary suspension or restriction should be continued, modified, or terminated pending the completion of the investigation ...

The Suspension Provision, Section 6.C.1 of the Credentials Policy states, in relevant part:

(a) The President of the Medical Staff ... the CEO, or the Board Chairperson will each have the authority to suspend or restrict all or any portion of an individual's clinical privileges whenever, in their sole discretion, failure to take such action may result in imminent danger to

the health and/or safety of any individual....

This Court previously upheld the Superior Court's finding that Sternberg presented an imminent danger to the patients or staff:

[I]t is entirely reasonable to conclude that a doctor (a) with a long history of outbursts and uncontrolled anger; (b) who flouts the hospital's rules in an operating room setting; (c) knowing that he is under a "zero tolerance" directive; is engaging in self-destructive behavior. Werner and the MEC did not have to wait until that self-destructive behavior resulted in actual harm. Based on his most recent conduct, it was reasonable to believe that Sternberg was uncontrollable and, therefore, presented a threat of harm to patients or staff.[17]

Sternberg nevertheless argues that this finding was based on an objective standard—a standard required under the HCQIA—and that an analysis under the Credential's Policy requires a subjective analysis. But even under a subjective analysis, Sternberg's claim still fails.

The Credentials Policy grants the CEO wide latitude in making a preliminary suspension. The Policy states it is within the CEO's "sole discretion" to suspend a Doctor's clinical privileges. The Credentials Policy does not require the CEO to conduct any specific investigation of the facts he already knows or to make a formal explanation of his or her decision before acting to protect the health and safety of an individual in imminent danger. The MEC members then need only "consider[ ] the matter[ ]" and "determine whether

dentials policy. This argument—even if not waived—is without merit, as the record shows members of the Medical Staff have the opportunity to participate in the drafting process of the Medical Staff By–Laws.

Appellee's Appendix at B–2; Appellee's Supp. Memo. of Law Ex. D; Appellee's Supp. Memo. of Law Ex. E.

17. *Sternberg,* 15 A.3d at 1232.

there is sufficient information to warrant a final recommendation, or whether it is necessary to commence an investigation." This provision does not require, as Sternberg suggests, that the MEC itself decide whether to suspend or to make any factual findings of its own. The CEO and the MEC followed the prescribed procedures in this case.

■ Werner was aware of Sternberg's disruptive behavior, that the MEC had recommended Sternberg's privileges be revoked, and that Sternberg had been warned against conducting political campaign activities in the Hospital. Werner had an adequate reason to conclude that Sternberg presented a threat of harm to patients or staff. Once Werner made that determination, which he could make in his sole discretion, it was reasonable on the facts of this case for the MEC to find "sufficient information to warrant a final recommendation." It is not the role of the courts to "substitute our judgment for that of the hospital's governing board or to reweigh the evidence regarding the renewal or termination of medical staff privileges." [18]

■ Finally, the trial court noted that Sternberg, during his initial suspension, engaged in negotiations with the MEC to re-characterize the suspension as a leave of absence to avoid reporting the conduct to the federal database. [19] The trial court held that the negotiations and re-characterization of the suspension rendered Sternberg's argument that the MEC did not follow appropriate procedure moot. [20] Sternberg renegotiated the precautionary suspension in order to avoid an Adverse Action Report to the National Practitioner Data Bank. In negotiating that settlement, Sternberg avoided a hearing on the matter before a panel in accordance with the Credentials Policy. We agree with the trial court that because Sternberg was never suspended formally due to the settlement, his challenge of the procedures that could have—but did not—lead to a suspension, under the bylaws is moot.

### The Superior Court did not abuse its discretion in awarding attorney's fees

■ Sternberg claims that because Nanticoke only prevailed on one of two claims on the first appeal, they should only be entitled to 50% of their attorney's fees. We review for an abuse of discretion the trial court's assessment of attorney's fees. [21]

We have identified the appropriate factors for a trial judge to consider in awarding attorneys fees in contract litigation as follows:

> Under the American Rule and Delaware law, litigants are normally responsible for paying their own litigation costs. An exception to this rule is found in contract litigation that involves a fee shifting provision. In these cases, a trial judge may award the prevailing party all of the costs it incurred during litigation. Delaware law dictates that, in fee shifting cases, a judge determine whether the fees requested are reasonable. To assess a fee's reasonableness, case law directs a judge to consider the factors set forth in the Delaware Lawyers'

18. *Bryan v. James E. Holmes Reg'l Medical Ctr.*, 33 F.3d 1318, 1337 (11th Cir.1994) (*quoting Shahawy v. Harrison*, 875 F.2d 1529, 1533 (11th Cir.1989)).

19. *Sternberg*, C.A. No. 07C–10–011, slip op. at 18 (Del.Super., Feb. 13, 2012).

20. *Id.*

21. *Roadway Express v. Folk*, 817 A.2d 772, 776 (Del.2003) (*citing Pollard v. The Placers, Inc.*, 703 A.2d 1211, 1213 (Del.1997)).

Rules of Professional Conduct, which, include:

(1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;

(2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;

(3) the fee customarily charged in the locality for similar legal services;

(4) the amount involved and the results obtained;

(5) the time limitations imposed by the client or by the circumstances;

(6) the nature and length of the professional relationship with the client;

(7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and

(8) whether the fee is fixed or contingent.[22]

The trial court in this case weighed the above factors in deciding the reasonableness of the attorney's fees. Sternberg does not challenge the trial court's finding on any particular factor. Rather, he asserts as a general proposition that since Nanticoke did not fully succeed on appeal, the award of fees should be reduced *pro rata.*

In Sternberg's first appeal, we upheld the trial court's determination that Nanticoke and the individual defendants were immune from suit. We also ruled that the record did not support an award of fees under the HCQIA's bad faith standard. Sternberg is correct that Nanticoke did not prevail on the award of attorney's fees under the HCQIA. But, we have previously held that a litigant's success in the proceeding is but one factor to be consid-

ered in determining the amount of attorney's fees to award, and this factor may be outweighed by the other factors.[23]

The Credential Policy provides that claimant shall pay the hospital's attorney's fees and costs if "an individual institutes a legal action and it does not prevail." In this legal action, Sternberg has not prevailed. Accordingly, it was not an abuse of discretion for the trial court to award—as the contract provides—"all costs incurred in defending such legal action, including reasonable attorney's fees."

### Conclusion

The judgment of the Superior Court is **AFFIRMED.**