# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| GREAT HILL EQUITY PARTNERS IV, LP, GREAT HILL INVESTORS LLC, FREMONT HOLDCO, INC., and BLUESNAP, INC. (F/K/A PLIMUS), | ) ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | C.A. No. 7906-VCG |
| SIG GROWTH EQUITY FUND I, LLLP, SIG GROWTH EQUITY MANAGEMENT, LLC, AMIR GOLDMAN, JONATHAN KLAHR, HAGAI TAL, TOMER HERZOG, DANIEL KLEINBERG, IRIT SEGAL ITSHAYEK, DONORS CAPITAL FUND, INC., and KIDS CONNECT CHARITABLE FUND, | ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Date Submitted: September 21, 2020
Date Decided: December 31, 2020

Rudolf Koch, Robert L. Burns, and Megan E. O'Connor, of RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; OF COUNSEL: Adam Slutsky, of GOODWIN PROCTER LLP, Boston, Massachusetts, *Attorneys for Plaintiffs Great Hill Equity Partners IV, LP, Great Hill Investors LLC, Fremont Holdco, Inc., and BlueSnap, Inc. (f/k/a Plimus)*.

William B. Chandler III, Ian R. Liston, and Jessica A. Hartwell, of WILSON SONSINI GOODRICH & ROSATI, P.C., Wilmington, Delaware; OF COUNSEL: Mark A. Kirsch, Scott A. Edelman, Aric H. Wu, Laura K. O'Boyle, and Peter Wade, of GIBSON, DUNN & CRUTCHER LLP, New York, New York, *Attorneys for Defendants SIG Growth Equity Fund I, LLLP, Susquehanna Growth Equity, LLC,*

*Amir Goldman, Jonathan Klahr, Donors Capital Fund, Inc., and Kids Connect Charitable Fund.*

Lewis H. Lazarus of MORRIS JAMES LLP, Wilmington, Delaware; OF COUNSEL: Peter N. Flocos and Joanna A. Diakos, of K&L GATES LLP, New York, New York, *Attorneys for Defendants Tomer Herzog and Daniel Kleinberg*.

David S. Eagle and Sean M. Brennecke, of KLEHR HARRISON HARVEY BRANZBURG LLP, Wilmington, Delaware; OF COUNSEL: Michael K. Coran, William T. Hill, Monica Clarke Platt, and Gregory R. Sellers, of KLEHR HARRISON HARVEY BRANZBURG LLP, Philadelphia, Pennsylvania, *Attorneys for Defendants Hagai Tal and Irit Segal Itshayek*.

GLASSCOCK, Vice Chancellor

Just over a century ago, the British army commenced one of the last great set-piece battles of World War I. The object was to break across the German trenches at the Ypres salient, in Flanders, and take the Passchendaele Ridge, and then the ports on the Belgian coast where the Germans maintained U-boat bases. The British offensive, after first making good progress in June to take nearby Messines Ridge, was launched in earnest on July 31, 1917. The British "count[ed] on an early breakthrough"[1] to Passchendaele, but progress was slower than expected, as heavy rains (and the effects of 4.5 million British artillery shells fired into the German lines) turned the Flanders plain into a near-impassable swamp. By late August, the British had lost 70,000 men with little progress made, but the decision was taken to redouble efforts with fresh troops. The fighting continued for weeks, months, with the British making slow progress. Finally, on November 6–10, Canadian troops under British command took the village of Passchendaele and cleared Passchendaele Ridge, in what the Encyclopedia Britannica calls an "ostensible British victory."[2] Strategically, the offensive failed, and the Allied forces were "no nearer reaching the ports that formed [their] goal than when" the battle commenced.[3] The German Army could be credited with a similar Pyrrhic victory—their defense had cost them only

---

[1] Battle of Passchendaele, Encyclopedia Britannica (July 24, 2020), https://www.britannica.com/event/Battle-of-Passchendaele.
[2] *Id.*
[3] *Id.*

220,000 killed and wounded; the British suffered 275,000. The British effort had advanced their line five miles.

And then there was *Great Hill Equity Partners IV, LP v. SIG Growth Equity Fund I, LLLP*.

The parties in this matter, at the end of years of litigation, each seek their legal fees. This Memorandum Opinion addresses what is, for me, a novel issue of contractual fee shifting. The litigation itself, involving sale of a business, has been complex, involving a multi-year struggle with multiple motions trivial and profound. It resulted in a finding of fraud against one defendant, but the related damages went largely unproven. It resulted in findings of breaches of warranty, but the resulting contractual damages were far less than the Plaintiffs had sought. Other substantive claims survived motions to dismiss and for summary judgement, but were unproven after trial. The legal fees involved in obtaining these results run to multiple millions of dollars.[4] Both sides here assert entitlement to shift fees onto their opponents; those fee-shifting requests are addressed below.

The merger agreement that controls here (the "Amended Merger Agreement") contains a fee-shifting provision. The prevailing party, if any, is entitled to shift its fees. Here, however, there is no identifiable "prevailing party," as each party

_____

[4] At oral argument, the amounts sought by each party were clarified; the Plaintiffs seek $18.7 million and the Defendants seek $38.1 million. 9-21-2020 Oral Argument Re Motions for Award of Fees and Expenses, at 26, 37, Dkt. No. 717 [hereinafter "Fees Transcript"].

received a mixed result. In that case, the contract directs that fees be apportioned on an "equitable basis."

This is the novel issue, for me at least. What does equity require where the parties have received such mixed results after such formidable efforts? I have been deciding cases in equity for twenty years. This Court of equity applies the American Rule on legal fees: each party bears its own. This is problematic in some ways—the winning party in a sense is not made whole if the costs of redress must be netted from the litigation result. Yet the rule also has equitable and policy advantages; it encourages a rational level of effort be devoted to the result desired, thus limiting speculative or pernicious levels of litigation, and it avoids the stifling of meritorious actions due to the implied threat of fee shifting. The harsh aspects of the American Rule are ameliorated through various exceptions that allow fee shifting in the name of efficiency and equity. None, I note, would be applicable here, other than the contractual fee shifting at issue.

It is, I think, obvious that the parties to the Amended Merger Agreement meant something other than, in cases of no prevailing party, "apply the American Rule." Instead, I am to apply equity, presumably to achieve a fair result, in light of the circumstances extant in the litigation, and in light of its results. I find, nonetheless, that, in this vigorously litigated matter—with its many issues, contested strenuously, to decidedly mixed results—equity is best served by leaving the fees in

3

repose, with each party to bear its own. Given the many litigation choices each party made, with varying outcomes, I find it equitable that each party bear the cost of those choices, and I find fee shifting under the contract, therefore, unwarranted in light of equity.

I discuss this, as well as the Plaintiffs' attempt to recover fees under the contractual indemnification provision, in more detail below.

## I. BACKGROUND[5]

This is my fourth Memorandum Opinion in this case (and the first to come in under 50 pages).[6] The first such opinion resolved motions to dismiss by certain of the defendants, granting and denying them in part.[7] The second opinion, *Great Hill I*, was a post-trial opinion that resolved the counts in the Complaint in a decidedly mixed way, finding breaches of warranty and fraud committed by one defendant but finding no fraud on the part of another defendant, no civil conspiracy, and no aiding and abetting of fraud.[8] The third opinion, which I refer to as *Great Hill II*, addressed

---

[5] The facts, except where otherwise noted, are drawn from exhibits jointly submitted at trial and are referred to according to the numbers provided on the parties' joint exhibit list ("JX __").

[6] I have previously issued letter decisions and then-Chancellor Strine has also issued a memorandum opinion in this case. *Great Hill Equity Partners IV, LP v. SIG Growth Equity Fund I, LLLP*, 80 A.3d 155, 155 (Del. Ch. 2013).

[7] *Great Hill Equity Partners IV, LP v. SIG Growth Equity Fund I, LLLP*, 2014 WL 6703980 (Del. Ch. Nov. 26, 2014).

[8] *Great Hill Equity Partners IV, LP v. SIG Growth Equity Fund I, LLLP*, 2018 WL 6311829 (Del. Ch. Dec. 3, 2018) [hereinafter "*Great Hill I*"].

damages.[9]  Given the length and complexity of each opinion, I refer interested

readers, if any, to those opinions for a full recitation of facts.  This Memorandum

Opinion addresses solely the issue of fees under the Amended Merger Agreement.

### A. *The Merger Provisions at Issue*

This matter arose from the acquisition of a California corporation, Plimus,[10]

by a private equity firm, Great Hill.[11]  The Amended Merger Agreement contains

two provisions that are pertinent to the motions for fees here.  The first, Section

10.02(a), which bears the title "Indemnification Obligations; Claims" provides, in

relevant part, that:

> after the Effective Time, each Effective Time Holder, individually as
> to himself, herself or itself only . . . shall indemnify Parent and the
> Surviving Corporation . . . against such Effective Time Holder's Pro
> Rata Share of any actual loss, . . . whether or not arising out of third
> party claims (including . . . reasonable legal fees and
> expenses . . . ) . . . which such Parent Indemnified Person suffers,
> sustains or becomes subject to, as a result of, in connection with, or
> relating to: (i) any breach by the Company of any representation or
> warranty of the Company set forth herein . . . (ii) any breach by the
> Company of any of the covenants or agreements of the Company set
> forth herein to be performed on or before the Effective Time or any
> breach by such Effective Time Holder of any of the covenants or
> agreements of such Effective Time Holder set forth herein to be
> performed after the Effective Time; or (iii) any fines, penalties or
> similar assessments imposed against the Company . . . for violating
> applicable credit card association policies . . . with respect to excessive
> charge-backs or similar recurring payments during the period between

---

[9] *Great Hill Equity Partners IV, LP v. SIG Growth Equity Fund I, LLLP*, 2020 WL 948513 (Del.
Ch. Feb. 27, 2020) [hereinafter "*Great Hill II*"].
[10] Plimus is now known as BlueSnap.
[11] *Great Hill II*, at *1.  I refer to Plaintiffs Great Hill Equity Partners IV, LP, and Great Hill
Investors LLC collectively as "Great Hill."

the Agreement Effective Date and the one year anniversary of the Closing Date, by a credit card association, card-issuing bank, other credit card issuer or third-party payment processor with respect to, and only to the extent of, transactions occurring prior to the Closing Date.[12]

The second provision is Section 12.10, which is titled "Prevailing Party." That provision provides, in relevant part:

> If any litigation or other court action . . . is commenced by any party hereto to enforce its rights under this Agreement against any other party, all fees, costs and expenses, including, without limitation, reasonable attorneys' fees and court costs, incurred by the prevailing party in such litigation . . . shall be reimbursed by the losing party; *provided*, that if a party to such litigation . . . prevails in part, and loses in part, the court . . . presiding over such litigation . . . shall award a reimbursement of the fees, costs and expenses incurred by such party on an equitable basis.[13]

Although the Plaintiffs argue that Section 10.02 entitles them to their fees as "indemnification," for reasons set forth below, I find that argument unpersuasive. The controlling provision, to my mind, is Section 12.10, which requires that I award fees on "an equitable basis." What that entails, however, is best determined in the context of the history of this case.

### B. Case History

The docket for this case is over 600 items long, with the complaint dating from September 2012. The parties, in their cross-motions for fees, readily agree that this eight-year history involved an enormous effort by attorneys on both sides of the

---

[12] JX 796, at 69. The parties do not contest the meanings of any of the defined terms in this provision, focusing solely on certain phrases that contain no defined terms, as explained *infra*.
[13] JX 796, at 92.

6

aisle; attorneys, I note who are superb practitioners of law.[14]  To demonstrate that effort, I first take a tour through the docket[15]—one that includes a motion to dismiss, five motions for summary judgment, and "a ten-day trial at which the parties examined more than a dozen live witnesses, submitted over 2,000 exhibits, and lodged nearly 60 deposition transcripts."[16]

Great Hill filed its complaint on September 27, 2012.[17]  Certain defendants filed motions to dismiss on November 26, 2012.[18]  Another defendant filed an answer and counterclaim the same day[19]—to which the Plaintiffs later filed an answer.[20]  Over the next year, the parties briefed motions for disposition of privilege disputes,[21] and filed two motions for a protective order (one by the Plaintiffs and one

---

[14] *See* Opening Br. in Support of Defs.' Mots. for Awards of Fees, Costs, and Expenses 1, Dkt. No. 682 [hereinafter "Defs.' Opening Br."]; Plaintiffs' Memorandum in Support of Mot. for Attorneys' Fees and Costs 1–2, Dkt. No. 684 [hereinafter "Pls.' Opening Br."].  Interestingly, though unrelatedly, this case involves, or involved at some point, at least five current or former members of the Delaware Court of Chancery.  Of course, then-Chancellor Strine and I are two. Vice-Chancellor Slights and Justice Montgomery-Reeves, before taking the bench, each represented clients in this case at certain points in its eight-year history.  Former Chancellor Chandler also represented a party in the matter.

[15] For clarity's sake and because my tour already describes the docket items that are referenced, I will cite only to the docket number of each document, instead of providing the lengthy titles of each.

[16] Defs.' Opening Br. 1.

[17] Dkt. No. 1.

[18] Dkt. Nos. 40, 42.

[19] Dkt. No. 41.

[20] Dkt. No. 49.

[21] Dkt. No. 47, 58, 67, 69.

by the Defendants).[22]  These motions were heard on October 15, 2013,[23] and decided by then-Chancellor Strine on November 15, 2013.[24]

On April 7, 2014, the Plaintiffs filed an amended complaint,[25] which was answered by certain defendants on May 27, 2014.[26]  Other defendants moved to dismiss the same day.[27]  Briefing on that motion to dismiss concluded on July 11, 2014,[28] the oral argument was held on August 13, 2014,[29] and I issued a 76-page memorandum opinion on November 26, 2014 granting the motion in part and denying it in part.[30]  On January 22, 2015, certain defendants that had moved to dismiss filed answers to the amended complaint.[31]  The remaining defendants that had yet to file their answers to the amended complaint did so on February 25, 2015.[32]

Discovery continued.  On December 11, 2015, the Plaintiffs filed another motion for protective order,[33] which the Defendants opposed on February 12, 2016.[34]  That motion was decided from the bench on March 9, 2016.[35]  On March

---

[22] Dkt. Nos. 71, 72.
[23] Dkt. No. 95.
[24] Dkt. No. 96.
[25] Dkt. No. 97.
[26] Dkt. Nos. 102, 103.
[27] Dkt. No. 104.
[28] Dkt. No. 114.
[29] Dkt. No. 120.
[30] Dkt. No. 122.
[31] Dkt. Nos. 126, 127, 130, 131.
[32] Dkt. Nos. 145, 146, 147, 148.
[33] Dkt. No. 238.
[34] Dkt. No. 260.
[35] Dkt. No. 277.

24, 2016, certain defendants filed a motion to compel,[36] which the Plaintiffs opposed on April 7, 2016.[37] On July 22, 2016, the Defendants filed a joint motion to compel the Plaintiffs to respond to damages interrogatories.[38]

On December 22, 2016, the Defendants filed a combined total of five motions for partial summary judgment.[39] After briefing and oral argument, I denied all five motions in a letter opinion issued on July 26, 2017, finding that the issues would be best resolved with the benefit of trial.[40] As the trial date drew closer, the Defendants filed four motions in limine,[41] each of which was vigorously opposed.[42] I denied the first without prejudice by letter on November 13, 2017 and resolved the remainder at trial.[43]

The parties submitted post-trial briefing in 2018, with the opening post-trial brief submitted in late March,[44] the answering briefs at the end of May,[45] and the reply brief filed at the end of June.[46] Post-trial oral argument was held on August 7, 2018,[47] and I issued a 155-page memorandum opinion on December 3, 2018, which

---

[36] Dkt. No. 315.
[37] Dkt. No. 340.
[38] Dkt. No. 394.
[39] Dkt. Nos. 416, 423, 431, 432, 439.
[40] Dkt. No. 516.
[41] Dkt. Nos. 517, 518, 520, 522.
[42] Dkt. No. 532.
[43] Dkt. No. 563.
[44] Dkt. No. 609.
[45] Dkt. Nos. 623, 624, 625.
[46] Dkt. No. 634.
[47] Dkt. No. 642.

resolved the claims made in the amended complaint, but reserved the question of damages.[48] Briefing on damages proceeded shortly afterwards and oral argument was held almost a full year later, on November 15, 2019.[49] Following my February 27, 2020 memorandum opinion[50]—this time requiring only 67 pages—the parties began briefing their cross-motions for fees, which culminated in this opinion.

## II. ANALYSIS

"It has long been the practice of American courts to enforce the so-called 'American Rule'—which requires each party to pay his or her own legal costs, even the prevailing party."[51] But the American Rule has exceptions—the pertinent one here being that parties may agree to shift fees contractually.[52] The parties agree that the Amended Merger Agreement at issue addresses fee shifting. They contest which of two provisions controls the issue, however.

Both parties agree that one of the two provisions, Section 12.10, applies explicitly to the motions for fees here.[53] However, the Plaintiffs also argue that another provision, Section 10.02, provides for the shifting of reasonable legal fees as part of indemnification for litigation among the parties to the Agreement. That argument poses a question of contractual interpretation and I address it first.

---

[48] Dkt. No. 644.
[49] Dkt. No. 676.
[50] Dkt. No. 678.
[51] *Sternberg v. Nanticoke Mem'l Hosp., Inc.*, 62 A.3d 1212, 1218 (Del. 2013).
[52] *Id.*
[53] *See* Pls.' Opening Br. 8–13; Defs.' Opening Br. 2.

10

*A. Section 10.02 does not apply to the motions for fees because it does not explicitly provide for fee shifting between parties to the contract.*

"Delaware law adheres to the objective theory of contracts, *i.e.*, a contract's construction should be that which would be understood by an objective, reasonable third party."[54] When interpreting a contract, I must "give priority to the parties' intentions as reflected in the four corners of the agreement, construing the agreement as a whole and giving effect to all its provisions."[55] "[C]lear and unambiguous terms are interpreted according to their ordinary and usual meaning."[56]

Section 10.02 is an indemnification provision and, as the reader may surmise, the text of many such provisions may be interpreted broadly to include fee shifting. However, as then-Chancellor Strine remarked in *Senior Housing Capital, LLC v. SHP Senior Housing Fund, LLC*, there is little case law from our courts regarding application of broad indemnification terms to inter-party litigation fees.[57] In that case, which was decided in 2013, then-Chancellor Strine noted that

> [O]ur Superior Court has recently surveyed the practice of courts around the country, and found that there is a split among state and federal courts on whether indemnification provisions can be used as fee-shifting provisions. The Superior Court then followed the side with the slight weight of authority on the issue, holding that "indemnity agreements are presumed *not* to require reimbursement for attorneys' fees incurred as a result of substantive litigation between the parties to

---

[54] *Salamone v. Gorman*, 106 A.3d 354, 367–68 (Del. 2014) (internal quotation marks omitted).
[55] *Id.* at 368 (internal quotation marks omitted).
[56] *Paul v. Deloitte & Touche, LLP*, 974 A.2d 140, 145 (Del. 2009).
[57] *Senior Hous. Capital, LLC v. SHP Senior Hous. Fund, LLC*, 2013 WL 1955012, at *44 (Del. Ch. May 13, 2013).

11

the agreement absent a clear and unequivocal articulation of that intent."[58]

The then-Chancellor also highlighted that this Court had "recently applied New York law to construe an indemnification provision so as to exclude attorneys' fees on the ground that 'a party seeking indemnification for first-party claims must be able to point to specific language that is applicable to such claims.'"[59] Accordingly, the Court concluded that, as the agreements before it had "no specific language in the indemnification provision . . . that covers fee shifting," it would "not interpret the provision in an expansive way that would be inconsistent with the American Rule."[60]

Since then, a few cases have arisen regarding this issue. The Defendants point to one such case, *Deere & Co. v. Exelon Generation Acquisitions, LLC*, a decision from our Superior Court, which holds that "[i]n order for an indemnification provision to cover fee shifting among parties, the contract must specifically state that requirement."[61] And, as recently as a month ago, this Court touched upon the issue again in *Int'l Rail Partners LLC v. Am. Rail Partners, LLC*.[62] That case involved an indemnification provision in a corporate instrument, as opposed to the management

---

[58] *Id.* (quoting *TranSched Sys. Ltd. v. Versyss Transit Solutions, LLC*, 2012 WL 1415466, at *1–2 (Del. Super. Mar. 29, 2012).
[59] *Id.*
[60] *Id.* at *45.
[61] 2016 WL 6879525, at *1 (Del. Super. Ct. Nov. 22, 2016).
[62] 2020 WL 6882105, at *7 (Del. Ch. Nov. 24, 2020).

12

agreements at issue in *Senior Housing*, and the Court held that an indemnification did cover fee shifting in such a case. Although entities' governing documents are interpreted much like ordinary contracts, "another interpretative principle comes into play" in such cases because "indemnification and advancement provisions in an entity's governing document serve a broader public policy."[63] The case law, I find, may be harmonized by finding that purely contractual indemnification provisions only shift first-party claims if the contract explicitly so provides.

The Plaintiffs argue that Section 10.02 contains that intent explicitly. They point to the phrase "whether or not arising out of third party claims." They interpret this as a backhanded way of saying "including legal fees incurred in first party claims" and, accordingly, argue that Section 10.02 must thus apply to disputes between the parties to the contract.[64] I do not find these arguments persuasive. Section 10.02, to my mind, does not provide the "clear and unequivocal articulation" required to apply an indemnification provision to first-party litigation. Specifically, I find it unlikely that sophisticated parties, negotiating at arms-length, would have chosen the phrase "whether or not arising out of third party claims" to explicitly state that this provision was meant to shift fees in disputes between the parties.

---

[63] *Id.* at *8.
[64] Fees Transcript, at 8, 10.

Underscoring this point is the fact that the parties *did* include a clear and unequivocal articulation of an intent to shift fees elsewhere in the agreement—specifically, in Section 12.10. That provision directly addresses the fee shifting sought here. The Plaintiffs' reading, under which both sections apply to first-party litigation, leaves Section 12.10 little more than surplusage.[65] Under our law, a contract must be read as a whole, with each term, to the extent possible, given meaning.[66] I also note that "[u]sually, [s]pecific language in a contract controls over general language, and where specific and general provisions conflict, the specific provision ordinarily qualifies the meaning of the general one."[67] Here, there is no question that Section 12.10—which specifically provides for fee shifting for prevailing parties and for apportionment on an equitable basis where the prevailing party is unclear—is more specific as to fee shifting than Section 10.02's provision of indemnification "whether or not [the Loss] aris[es] out of third party claims."[68] Accordingly, I conclude that Section 12.10 controls the parties' motions for fees here, not Section 10.02.

---

[65] The Plaintiffs argue that Section 10.02 and Section 12.10 are complementary, because 10.02 addresses payments out of escrow, to which Section 12.10 is silent. Under the Plaintiffs' interpretation, the only situation in which Section 12.10 would serve a purpose is one in which the escrow funds are insufficient to cover reasonable fees. If this was the parties' intent, they did not state it clearly enough to overcome the presumption that indemnification provisions eschew payments for first-party litigation.

[66] *Sunline Commercial Carriers, Inc. v. CITGO Petroleum Corp.*, 206 A.3d 836, 846 (Del. 2019).

[67] *In re Shorenstein Hays-Nederlander Theatres LLC Appeals*, 213 A.3d 39, 62 (Del. 2019), *reargument denied* (July 8, 2019).

[68] JX 796, at 69, 82.

Finally, even if I am incorrect that Section 12.10 alone controls the issue of fees here, Section 10.02 (and, I note, public policy) only provides for indemnification of *reasonable* legal fees.[69] The term "reasonable legal fees," to my mind, must be related to the result achieved in the litigation.[70] And consideration of the result achieved also underlies my reasoning regarding the apportionment of fees "on an equitable basis" under Section 12.10. Thus, even if Section 10.02 did apply to litigation brought by a party to enforce the Agreement, it is likely that the amount of fees shifted would be similar to the result I reach below.

*B. Equity requires that no fees be shifted.*

Section 12.10 requires me to award fees "incurred by the prevailing party . . . ."[71] Although both the Plaintiffs and the Defendants[72] provide arguments as to why each is, in fact, the prevailing party, I find that neither party has truly prevailed. The Plaintiffs brought several claims, and, while they were successful in recovery on some of them, the ultimate damages awarded were minimal.[73] In

---

[69] JX 796, at 69.

[70] Indeed, "[i]n order to determine whether [an] attorney['s] fees are reasonable, the court must consider . . . (4) the amount involved and the results obtained . . . ." *Weichert Co. of Pennsylvania v. Young*, 2008 WL 1914309, at *1–*2 (Del. Ch. May 1, 2008) (quoting Del. R. Prof. Conduct R. 1.5(a)(4)).

[71] JX 796, at 82.

[72] There were, in fact, multiple parties involved in this litigation, each of which obtained idiosyncratic results—I refer to "Plaintiffs" and "Defendants" generally because the equitable considerations I am to bring to bear under the Agreement would not change in a party-specific context.

[73] The Plaintiffs ultimately recovered a total of $212,255.74, which amounts to 0.1739% of the Plaintiffs' requested damages of $122,026,076. *Great Hill II*, at *14, *24.

15

essence, it can be said that the Plaintiffs prevailed in proving some liability, but the Defendants prevailed in limiting the amount of damages. Given such results, I cannot find that either party "prevailed" and should be awarded fees as a matter of course under Section 12.10.

In the event that a party "prevails in part, and loses in part," I am to award fees "on an equitable basis."[74] As I detailed above, the parties, represented by excellent counsel, have litigated vigorously over non-frivolous claims for over eight years. They have filed numerous motions, endured with longanimity 10 days of trial, undergone both a liability and damages determination, and now seek fees. And yet the result was not a distinct victory for either side. Under such circumstances, I find that nothing is more equitable than to leave the fees in repose. An award of fees may be seen as a penalty for the party from which the fees must be paid. I find here that it would be inequitable to impose such a penalty, given the efforts of counsel on both sides and the results achieved.

## III. CONCLUSION

The parties' cross-motions for fees and expenses are DENIED. The parties should submit a form of order consistent with this Memorandum Opinion.

---

[74] JX 796, at 82.